**Horace G. Powers and Lillian C. Powers, Plaintiffs in Error, v. William B. Walrath and Florence G. Walrath, Defendants in Error.**

**Gen. No. 29,426.**

1. EXECUTION OF INSTRUMENTS—*presumption that person executing instrument after reading it did so understandingly.* Where a person of education and having had considerable business experience testified that he read a contract for the purchase of property it must be presumed that he knew what he was doing when he signed and delivered it.

2. MORTGAGES—*degree of proof requisite to declare absolute deed to be a mortgage.* To establish a deed absolute in form as a mortgage the proof must be clear and convincing.

3. MORTGAGES—*when agreement shown to one for purchase and resale and not absolute deed intended as mortgage.* In a suit to have a warranty deed delivered to defendant decreed to be merely a mortgage to secure a loan and that complainants be granted the right to redeem upon payment of the correct amount found to be due, *held,* that the evidence shows that defendant purchased the premises and agreed to resell to complainants.

4. USURY—*when transaction not shown to be cloak for usury.* A transaction by which a real estate dealer purchased residence property from the landlord of a tenant who held an option to purchase the property for $21,000 on specified terms at the request of the tenant who had been unable to borrow money to make the purchase on the terms of the option, and gave the tenant a contract to purchase the property at $30,000 on monthly instalments, is not shown to have been an usurious and unconscionable agreement where the evidence shows that it was not a loan transaction but one of purchase and resale, that the tenant would have lost his rights under the option because of inability to secure a loan to make the purchase except for the intervention of the

dealer, and there is no evidence of fraud, bad faith or duress in the transaction.

5. MORTGAGES—*propriety of dismissal of bill to declare convey-ance a mortgage.* A bill to have an absolute deed declared a mort-gage and to redeem therefrom was properly dismissed for want of equity where the evidence showed the transaction to have been an absolute one of sale to defendant by a third person of property for the purchase of which complainant held an option of purchase which he was unable to exercise for want of funds, that defend-ant gave complainant a contract to purchase the property for a specified sum to be paid monthly in instalments, that complain-ant, who had been in possession at all times either as tenant or under the contract, was greatly in default and his rights had been regularly declared forfeited.

6. MORTGAGES—*assignment of life insurance policy as evidence of mortgage character of transaction.* Where one desiring to pur-chase property was unable to make any down payment except the first monthly payment under the contract which was to be made, a requirement by the vendor that the vendee should assign to him a life insurance policy to protect him against the vendee's pre-mature death was not unreasonable and did not tend to sub-stantiate the vendee's contention that the transaction was really a loan instead of a sale.

Error by plaintiffs to the Circuit Court of Cook county; the Hon. HUGO M. FRIEND, Judge, presiding. Heard in the second divi-sion of this court for the first district at the February term, 1924. Affirmed. Opinion filed December 16, 1924. Rehearing de-nied December 27, 1924. *Certiorari* denied by Supreme Court (mak-ing opinion final).

SOREM, POWERS & WATTERS, for plaintiffs in error.

MACCHESNEY & BECKER, for defendants in error; NATHAN WILLIAM MACCHESNEY, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

This writ of error was originally sued out from the Supreme Court to review a decree of the circuit court of Cook county, entered November 27, 1923, dismiss-ing complainants' bill for want of equity after a hearing upon the merits. The prayer of the bill, filed September 12, 1923, was in substance that the war-

ranty deed, delivered to William B. Walrath (grantee) on March 5, 1920, to certain improved premises, known as 420 Elmwood avenue, Wilmette, Illinois, be decreed to be merely a mortgage to secure a loan made by him to Horace G. Powers, and that Powers be granted the right to redeem upon payment of the correct amount found to be due to Walrath. The Supreme Court held that a freehold was not involved, and, accordingly, the cause was transferred to this Appellate Court. (*Powers v. Walrath*, 311 Ill. 591, 593.)

In the decree the circuit court found in substance that by said warranty deed the title to the premises was taken by Walrath absolutely and that he was the owner of the premises; that by a certain ''instalment contract,'' signed by the parties, Walrath contracted to sell the premises to complainants as a ''straight purchase and sale transaction''; that the contract was a valid and binding one and was not unconscionable; that on August 31, 1923, Walrath lawfully and in accordance with its provisions declared the contract canceled, and all rights of the complainants therein then were forfeited; that complainants had failed to comply with the terms of the contract; and that they are now wrongfully in possession of the premises. The main contentions of complainants' counsel are in substance that the contract was an unconscionable one because usurious; that it was ''one of loan and not of sale''; and that the court erred in dismissing the bill for want of equity.

On June 1, 1919, one Henry Harfst was the owner of the premises and on that day Powers became his tenant, under written lease expiring May 31, 1922, at a monthly rental of $200. On the day the lease was executed Harfst signed a paper, giving Powers an option to purchase the premises for $21,000, at any time before December 1, 1919. On November 28, 1919, Harfst extended the period of the option by written

indorsement on the paper as follows: "In consideration of $500 as earnest money to apply on above purchase price I extend above option to February first" (1920). At this time there were two mortgages on the premises, aggregating $11,200, and the arrangement between Powers and Harfst was that if the former purchased the premises he was to pay to Harfst $9,800 in cash and assume the mortgages, making the total price $21,000. Powers, although then receiving an annual salary of $7,500, as general purchasing agent of a trading corporation, was of limited financial ability and unable to make any substantial cash payment. He applied to a bank in Evanston, Illinois, for a loan. The bank refused to make the loan, but suggested that he confer with Walrath, who was then engaged in a real estate business in Chicago. About January 20, 1920, before said option as extended had expired, Powers first called on Walrath, explained the situation and stated his desire to obtain financial assistance so as to enable him to take advantage of the option. Walrath replied that he "never made loans," but that he sometimes bought houses for cash and sold them on the monthly instalment plan, and that the only way he could consider taking the matter up would be on such a basis. Powers then stated that he was unable to make any cash payment but that he could make monthly payments of about $300, and asked what would be the price to him if Walrath bought the premises and sold them to him on the monthly instalment plan, the instalments to be about $300. After making computations Walrath replied that the price would be about $30,000. Powers said this was too much and left Walrath's office. There is evidence tending to show that, upon Powers stating to Harfst that he was unable to take up the option on February 1, but that he hoped soon to be able to do so through a party with whom he was negotiating, Harfst verbally agreed to a further ex-

tension of the option. About February 5, Powers again called on Walrath and renewed negotiations. Walrath then said that, before he could consider purchasing the premises and reselling them to Powers on the instalment plan and at said price, he would have to examine the property. This Walrath did in company with an appraiser, and at a third conference, had a few days later, he told Powers that he would be willing to purchase the premises, make said cash payment and assume said mortgages, and resell the premises to Powers at said price of $30,000 on the monthly payment plan, in accordance with certain conditions and provisions, then discussed, to be incorporated into a written contract. Powers testified that at this interview Walrath told him that he estimated the replacement value of the building on the land to be $29,000. The record does not disclose any estimate as to the value of the land alone. Powers' estimate of the value of the land and building was "$30,000 or $35,000." On February 20, Walrath forwarded two copies of the contract, dated February 20, to Powers, and about a week thereafter Powers returned them, signed by himself and wife and acknowledged before a notary on February 27, to Walrath. It thus appears that Powers had ample opportunity to consider all the provisions of the proposed contract. He was an educated man and had had considerable business experience. He testified that he read the contract, and it must be presumed, when he signed and delivered it, that he knew what he was doing.

The contract provided *inter alia,* that if the second parties (complainants) made the payments and performed their covenants therein mentioned, the first party (Walrath) would convey the premises to them, subject to certain taxes and assessments and to said two mortgages aggregating the sum of $11,200, which said sum "is included in the sale price hereinafter

mentioned of $30,000, and it is understood and agreed that out of the payments to be made to said first party by said second parties said first party will pay the interest payments on said notes and the principal notes secured by said second trust deed as they fall due''; that ''said second parties * * * agree to pay to said first party * * * the sum of $30,000, with interest at six per cent per annum, payable monthly, as follows: $300 on March 1, 1920, $300 on the first day of each of the next 23 months, $350 on March 1, 1922, and $350 on the first day of each month thereafter until said sum and said interest are fully paid,—said monthly instalments shall be applied first on interest on the principal sum remaining from time to time unpaid and the remainder on principal, and as soon as said second parties have paid said purchase price *down to the amount of the mortgage* at that time on said premises, said first party shall convey said premises to said second parties subject to said mortgage, which said second parties shall assume and agree to pay as the remainder of the purchase price''; and that said ''second parties further agree that beginning May 1, 1920, they will pay to said first party on the first day of each month, *in addition* to the monthly payments above mentioned, one-twelfth of the amount necessary to pay the annual taxes and special assessments, and it is estimated that the amount which will be required to pay the taxes and special assessments on May 1, 1921, is $300, and accordingly said second parties agree to pay to said first party, on the first day of each of the twelve months beginning May 1, 1920, one-twelfth of said amount, or $25, *in addition* to the above-mentioned monthly payments; * * * and this arrangement shall continue during the life of this contract, and if in subsequent years the taxes are increased then the monthly payments to cover the same shall be increased proportionately.'' The contract further provided that ''said second parties shall have the right

to pay more each month than the above-mentioned monthly payments," and "to make payment at any time of the entire balance of the purchase price less the amount of the encumbrance thereon at that time, and receive conveyance subject to said encumbrance''; and that if the second parties failed to make any of the payments mentioned, or failed to perform any of their covenants, "this contract shall, at the option of said first party, be forfeited and determined and said second parties shall forfeit all payments made on this contract, and such payments shall be retained by said first party in full satisfaction and in liquidation of all damages sustained, and said first party shall have the right to re-enter and take possession of the premises, or if said second parties fail to make either of the payments, or any part thereof, as hereinbefore agreed, and if said default shall continue for the period of 60 days, then the first party shall, if he so elects, have the right to declare all of the deferred payments immediately due and payable." The contract mentioned that the second parties had assigned and delivered to Walrath a policy of life insurance for $5,000 on Powers' life, and it was agreed that in the event of Powers' death Walrath should have the right to collect and receive the proceeds of the policy, which in that event should be credited on the contract, and it was further agreed that as soon as the second parties had paid $10,000 in principal on the contract then Walrath should reassign and deliver the policy to them, provided they were not then in default in their payments.

Shortly before February 20, 1920, Harfst deposited in escrow, with the escrow officer of the Chicago Title & Trust Co., a warranty deed of the premises, subject to said two mortgages aggregating $11,200, and to certain taxes and assessments mentioned. The deed ran to Walrath. Harfst told the escrow officer the net amount that would be due to him and instructed

the officer to deliver the deed upon payment of said amount in cash. On March 1, the two copies of the contract were signed and acknowledged by Walrath and wife. On March 5 the entire transaction was consummated. In the forenoon Walrath paid in cash to the escrow officer the amount coming to Harfst, about $9,800, and received Harfst's said warranty deed and a guaranty policy of the Title & Trust Co. showing good title in Walrath, subject to said two mortgages. During the afternoon Powers came to Walrath's office and the lease of the premises to Powers was canceled by mutual consent and an indorsement made on the lease to that effect. Powers paid to Walrath $300—being the first instalment due under the terms of the contract and Walrath delivered to Powers one copy of the contract, retaining the other. Powers continued to live on the premises.

For about nine months Powers promptly made all payments as provided in the contract. Then he lost his position and he began to fall behind. He obtained other temporary employments but his monthly payments became less and very irregular. He made no further payments for taxes, insurance or special assessments. As to the monthly payments for the year ending August 30, 1923, he paid only $1,200, and for the year ending August 31, 1922, only $1,320. These payments for the two years averaged $105 per month, although he still continued to live in the premises, for which he had paid formerly to Harfst $200 per month as rent. From time to time Walrath wrote many dunning letters and many conferences were had. Finally Walrath reached the conclusion that it was impossible for Powers to comply with the contract, and on August 31, 1923, he served complainants with notice of cancellation and forfeiture under its terms. He also served a written demand for possession of the premises and thereafter commenced a forcible detainer action, the prosecution of which was suspended

upon the filing of the present bill. At this time Powers had made total payments of about $6,500 and Walrath had expended over $17,300, including the initial payment to Harfst. Walrath claimed that there was then due him from complainants under the contract over $8,200. Walrath testified that, even though the contract had been canceled, he would be willing, if the whole amount payable under the contract was paid, to deed the property in accordance with the terms of the contract.

After a careful consideration of the evidence we have reached the conclusion that the circuit court did not err in dismissing the bill for want of equity. We think there was an absolute sale of the premises by Harfst to Walrath, though made with the understanding that Walrath would agree to resell the premises to complainants under the provisions of the instalment contract which was then delivered. Walrath did not make loans. He refused to loan Powers any money on any security. The evidence shows in substance that Walrath purchased the premises from Harfst for cash and the assumption of certain existing mortgages, which was the only way Harfst would sell, and agreed to resell the premises to Powers on time, which was the only way Powers could buy. There is no evidence of fraud, bad faith or duress in the transaction. And we do not think that it was consummated in the manner shown for the purpose of evading the usury laws of the State; or that the contract was an unconscionable one. The circuit court made a finding in the decree that Walrath had "acted with perfect candor and fairness towards complainants in the whole transaction." In an opinion of our Supreme Court, in the case of *Eames v. Hardin*, 111 Ill. 634, 640, certain principles of law are set forth, which we think are applicable to the present case, as follows:

"All cases hold, that to establish a deed absolute

in form a mortgage, the proof must be clear and convincing. It is never done on vague and inconclusive evidence. It may be proved by verbal testimony, but it must be entirely satisfactory, if not conclusive. * * *

"There is nothing in the form of the transaction to indicate that there was a loan of any sum whatever. On the contrary, it appears to have been a purchase of these lots by appellants, at the urgent solicitation of Hardin, with an agreement that he would purchase them at an advanced price from appellants. Surely no one can be found who will deny that the parties had the power to agree that appellants should purchase, and sell the property to Hardin, without the transaction becoming a loan, and a mortgage to secure the payment of the sum advanced to make the purchase. The doctrine is well settled that a party may purchase land for another, take the deed in his own name, and bind himself to convey it to the person at whose instance it was purchased, on being paid the purchase price agreed upon between the parties. The doctrine is well established that one person may purchase land of another, and sell it back to him on the payment of a stipulated price. Such purchases and resales are always sustained where the transaction is in good faith, and is not resorted to for the purpose of evading the usury laws, or the transaction is not tainted with fraud."

Complainants' counsel argue that the fact that it was provided in the contract that Powers should assign his life insurance policy to Walrath is evidence tending to substantiate their contention that the transaction was really a loan and not a sale. We cannot agree. Walrath testified: "I told him (Powers) that, in view of the fact that he was not able to make * * * any cash payment except one monthly payment of $300, I would want him to transfer to me a life insurance policy, * * * at least $5,000 of life insurance * * * to protect me against * * * his premature death. I insisted on having the policy assigned to me and he said that was all right." Under

the circumstances this was not an unreasonable requirement, treating the transaction as a sale. A somewhat similar contention was made by Hardin in *Eames v. Hardin, supra,* and decided adversely to him. The court says (pp. 643-4):

"But it is said, if it was a sale why did appellants require the eighty acres to be conveyed to them, and embraced in the agreement to convey to Hardin? Appellants did not purchase the property to hold, but they purchased it for Hardin. They, as a matter of prudence, desired to provide against any contingency of being required to hold the property. * * * It was to compel Hardin to perform his agreement, or on a default on his part to have abundant means out of which to realize the money they advanced to procure and perfect the title. * * * Had Hardin paid any considerable part of the purchase money down, then perhaps no necessity would have existed for taking a lien on other property to secure the performance of the contract; but such was not the case. Hardin paid nothing down. Suppose Hardin had proposed to give appellants $16,000 if they would procure title and convey these seven lots to him, would any person suppose that would be a loan or security? And if on such an offer they had purchased the lots for $14,000, would anyone contend the $2,000 advance, or profit, was usury? We apprehend not. Such a transaction would be upheld by all legitimate rules of business. * * * A person owning and selling property may undeniably take security for the payment of the purchase money without converting the transaction into a loan. And for the same reason, where one person purchases land for another, on an agreement that the person for whom the purchase is made will pay a specified price, and secure the payment by pledge of other land, there is not a single ingredient of a loan."

For the reasons indicated the decree of the circuit court should be affirmed and it is so ordered.

*Affirmed.*

FITCH, P. J., and BARNES, J., concur