[Civ. No. 1784. Fourth Appellate District.—December 17, 1936.]

MILEY PETROLEUM CORPORATION, LTD. (a Corporation), Appellant, v. AMERADA PETROLEUM CORPORATION (a Corporation) et al., Respondents.

Everts, Ewing, Wild & Everts, McAdoo, Neblett & Warner, E. H. Mitchell and John G. Sobieski for Appellant.

A. L. Weil and Kirk E. Boone, for Respondents.

MARKS, J.—Plaintiff has appealed from a judgment in favor of defendants. In this action plaintiff sought cancellation of assignments of oil leases on property in the North Dome of the Kettleman Hills oil fields in Kings County, cancellation of a mortgage, and of a drilling agreement providing for the development of the leases, upon the ground that the documents constituted a single contract which was usurious and void. Plaintiff also sought an accounting and damages.

The facts presented by the record are involved but it will only be necessary to detail such of them as will sufficiently explain the question presented for our decision.

In 1924 the Marland Oil Company of California executed two oil leases on property in the North Dome of the Kettleman Hills oil fields to E. J. Miley. On October 27, 1926, Miley assigned these leases to the Miley Oil Company. On the next day that company assigned the leases to the Farmers and Merchants National Bank of Los Angeles, in trust, to secure a loan of $100,000. At that time both Miley and the Miley Oil Company were indebted to numerous creditors in sums totaling more than $2,000,000. All of the receipts from the oil production of the two debtors had been taken over by the Associated Oil Company, one of the major creditors, and the proceeds applied upon its claim. The wages of various employees of Miley and the Miley Oil Company were unpaid and labor claims had been filed with a deputy labor commissioner.

About this time valuable oil wells were brought in on the North Dome of the Kettleman Hills oil fields which gave a considerable value to the oil leases here involved. It seemed probable that these leases might be of sufficient value and might produce a sufficient revenue to liquidate the indebtedness of Miley and the Miley Oil Company. In 1929 the leases were assigned to Messrs. DeLorme, Neblett and Thayer, as trustees, for the purpose of attempting to work out the tangle in the financial affairs of Miley and the Miley Oil Company.

The trustees devised the plan of organizing a new corporation to which the leases would be assigned. It was proposed to issue $2,000,000 in bonds which would be delivered to the creditors in payment of their claims. It was necessary, also,

to secure between $250,000 and $500,000 with which to pay, in cash, the creditors who would not accept bonds. The trustees also proposed to enter into a fifty-fifty drilling agreement with a major oil company for the purpose of having oil wells drilled on the leases. It was hoped the $250,000 to $500,000 could be secured from this oil company. The new corporation, the plaintiff, was organized and many creditors agreed to accept its bonds in payment of their claims.

The trustees negotiated with several major oil companies, among them the General Petroleum Corporation, in an endeavor to secure the fifty-fifty drilling contract and the payment of from $250,000 to $500,000 for its execution. They were unsuccessful, but the General Petroleum Corporation submitted a counter offer which is described in plaintiff's opening brief as follows (transcript references deleted):

"1st. That the new Miley Corporation execute to General a five-year note in said sum bearing 6% interest, and a mortgage securing the same, which mortgage must be a first lien upon all of its assets, including the two North Dome leases, the Maddox permit, and its interest in a 'fifty-fifty' operating agreement, and that the proposed bonds, to be used for the payment of creditor's claims, be secured by a second lien, instead of a first lien, trust indenture.

"2nd. That the new Miley Corporation concurrently give, instead of sell, to General, a 50% working interest in the two leases and the Maddox permit, such working interest to be evidenced by

"(a) An outright assignment of the two leases and permit to General; and

"(b) The execution then by the parties of a 'fifty-fifty' drilling or operating agreement whereby General would drill and operate the properties, the expense thereof repayable to it out of production, and would retain one-half of the net production and pay the other half to the new Miley Company."

Generally speaking, this proposition was accepted and put in effect by a mortgage securing a note for $250,000, an assignment of the leases, and a fifty-fifty drilling contract. The mortgage and note were made to the Amerada Petroleum Corporation which also executed the fifty-fifty drilling contract with plaintiff. The Amerada Petroleum Corporation of California took over all of the assets of the Amerada

Petroleum Corporation in California and assumed and agreed to perform all of its obligations in that state.

It is contended by plaintiff that the loan of $250,000 was the principal transaction between it and the defendants, and that the fifty-fifty drilling contract and the assignment of its leases were exacted from it as a bonus for making the loan; that the leases had a value of many hundred thousand dollars which made the transaction usurious and therefore void. (Stats. 1919, p. lxxxiii.) On the other hand, the defendants contend that the drilling contract was the main concern of the parties, and that the loan was only incidental to it and necessary to permit the execution of the drilling contract and to enable the carrying of its terms into effect because it was imperative that the debts of Miley and the Miley Oil Company be liquidated so that threatening bankruptcy proceedings be avoided and the operating company be given and allowed to retain quiet and uninterrupted possession of the leased property during the development and production period.

Fifty-fifty drilling contracts are not strangers to the oil industry and are used on suitable occasions. When they are used leases are usually assigned to the operating company as it is not an unreasonable requirement that it be given the lessee's interest in the land, it being required to perform the lessee's obligations and to expend large sums of money in the drilling operations which it can only recover if oil is discovered and produced. That it should hold the lessee's title is a proper incident of such a contract.

The contract before us is drawn upon the theory just outlined. It contains the following provisions as to the division of the proceeds of hydrocarbon substances obtained from the leased premises:

' "3. Whenever oil and/or gas is produced in paying quantities from any parcel of demised land, then whenever any third person under any agreement herein mentioned is entitled to any payments or royalties from any parcel of land, such payments or royalties shall be paid to him from the proceeds of the production from that particular parcel of land; provided that should any of said parties have the right to take his share of the production in kind instead of in money, then the oil shall be delivered in specie to such person instead of the cash payment.

"4. The balance of the proceeds of the sale of oil and/or gas from demised land shall be disposed of as follows:

"(a) To the payment of Federal taxes (excepting income tax), and state, county and local taxes, and governmental and municipal license fees and charges of every kind;

"(b) To all operating expenses, which shall include the drilling, maintenance, pumping, cleaning out, repairing, deepening and redrilling of all wells by Amerada, together with the cleaning of oil, payments for claims for damages, costs of litigation, and, without limitation by reason of the specific recitals herein enumerated, any expenditures reasonably appropriate to the proper handling of the demised land and of the oil and/or gas therefrom;

"(c) After the payments heretofore in this agreement provided, and after the establishment of a fund for development work, reasonably anticipated in the immediate future, the balance of the proceeds is hereby defined as 'net proceeds' and shall be distributed as follows:

"(1) Fifty per cent. (50%) of the net proceeds to Amerada;

"(2) Of the balance remaining there shall be retained by Amerada:

"(aa) Any instalment of principal and/or of interest due on the promissory note from Miley to Amerada, dated October 18, 1929, and secured by a real and chattel mortgage upon property of Miley;

"(bb) Any amounts paid to Dickson F. Maddox under paragraph 3 hereof over and above the amount of the seven and one half per cent. (7½%) royalty provided to be paid to the said Maddox from said permit land in said agreement of April 19, 1927; all amounts in excess of said seven and one half per cent. (7½%) royalty being for the account of the said Miley;

"(cc) The amount of five per cent (5%) overriding royalty paid to Associated Oil Company, F. V. Gordon and Jacques Vinmont from said fee land for the account·of Miley under paragraph 3 hereof.

"Whatever is left of said balance thereafter shall be paid to Miley."

The mortgage given to secure the promissory note of $250,000 was upon real and personal property, and was not

unusual in form, except in its provisions concerning the repayment of the loan, which are in part as follows:

"It is understood that the parties hereto have entered into a drilling and operating agreement, dated October 18, 1929, applicable to certain leases included in this mortgage. A true copy of said drilling and operating agreement is hereto attached, marked Exhibit 'B', and made a part of this mortgage. It is proposed to retire the indebtedness secured by this mortgage by the application thereon of a proportion of any proceeds which the Mortgagor may receive under the terms and conditions of said drilling and operating agreement. It is agreed that the Mortgagor shall pay to the Mortgagee, in discharge of the principal evidenced by said note, one half of any of the proceeds received by it from the said drilling and operating agreement in each year during the life of this mortgage, except the first two years thereof, provided, however, that one half of the proceeds from such drilling and operating agreement so applied on the indebtedness secured by this mortgage shall not be less than Fifty Thousand Dollars ($50,000) and not more than One Hundred Thousand Dollars ($100,000) for each of the years ending October 15, 1932, and October 15, 1933. In the event that one half of the proceeds from such drilling and operating agreement shall be less than Fifty Thousand Dollars ($50,000) for either of the years ending October 15, 1932, and October 15, 1933, then the Mortgagor shall pay to the Mortgagee a sum sufficient to bring the payment for each of these years up to Fifty Thousand Dollars ($50,000). In the event that the Amerada Petroleum Corporation surrenders the said drilling and operating agreement, or the same is for any reason terminated, then this sinking fund provision shall become null and void and the note shall be paid, principal and interest, in accordance with its terms, disregarding the sinking fund provisions mentioned therein and/or herein.

"It is expressly agreed that the loan of Two Hundred Fifty Thousand Dollars ($250,000) made by Amerada Petroleum Corporation to Miley Petroleum Corporation, Ltd., as evidenced by the note above referred to, is to be repaid by Miley Petroleum Corporation, Ltd., to Amerada Petroleum Corporation in the manner herein stated, and that said note and this mortgage which secures the same are executed in consideration of the payment to Miley Petroleum Corpora-

tion, Ltd., by Amerada Petroleum Corporation of the sum of Two Hundred Fifty Thousand Dollars ($250,000), without deduction whatsoever, and that the loan of said sum of Two Hundred Fifty Thousand Dollars ($250,000) as above referred to shall in no event be considered as a bonus or consideration, conditional or otherwise, paid by Amerada Petroleum Corporation to Miley Petroleum Corporation, Ltd., for or in relation to the drilling and operating agreement in this mortgage referred to, or that one is in anywise dependent upon the other, except in so far as the proceeds arising from said drilling and operating agreement may hasten the payments on said note; nor shall said loan ever be considered as a bonus or a consideration, additional or otherwise, for any other agreements between the parties hereto.

"It is further agreed that the transfer or assignment of any leases or permits by Miley Petroleum Corporation, Ltd., to Amerada Petroleum Corporation shall not affect the continuance of the lien of this mortgage as a first lien on all property covered hereby."

Defendants concede that where a debtor gives a consideration for a loan that will make the profits of the lender from the loan more than the maximum legal rate of interest no subterfuge of the parties will be permitted by the courts to conceal the real purpose of the transaction, and if in fact a usurious rate of interest is exacted the penalties of the usury law will be firmly imposed. They urge, however, that when "besides making the loan the lender obligates himself to pay out additional moneys or to render additional services, there is no usury".

The case of *Freedom Oil Works Co.* v. *Williams,* 302 Pa. 51 [152 Atl. 741], involves a question quite similar to the one before us. In that case the defendants desired to purchase a garage and in order to finance the purchase and procure necessary additional equipment they entered into a contract with plaintiff whereby plaintiff agreed to advance a sum not to exceed $10,000, to be secured by a mortgage, the principal to be repaid in instalments with interest at six per cent per annum. The defendants further agreed to procure certain equipment from the plaintiff under a bailment lease and to purchase from plaintiff exclusively all gasoline and oil used or sold at the garage for a minimum period of three years, and until the loan should be repaid.

The transaction was later continued for an additional period of five years in consideration of an advancement by plaintiff of an additional sum of $4,000. Defendants sold their business and repaid the loans. The purchaser declined to carry out the contract to sell only the products of plaintiff and action was brought to recover damages for breach of contract. The defendants interposed the defense of a usurious contract, urging that the profits derived by the plaintiff from the entire transaction brought the interest rate on the loan above the lawful maximum limit. The Supreme Court of Pennsylvania was of the opinion that no usury was proven and said:

"Apart from the loan, therefore, the contract was complete, mutual, and sustained by ample consideration. The mere fact that one who loans money with interest is induced to do so by an independent contract relating to collateral matters does not render the loan usurious, even though the borrower would not have entered into the collateral contract, except on condition that the loan be granted. A loan is not necessarily usurious by reason of its constituting part of an agreement between the parties which they regard as mutually beneficial and to which the loan is merely incidental. In other words, if, irrespective of the loan, the parties desire to enter into .a contract for their mutual benefit, the mere fact that, as part of the arrangement, a loan is made from one to another at a legal rate of interest to enable him to perform his part does not constitute usury, though the contract would not have been made without the loan."

In *Lamb* v. *Herndon*, 97 Cal. App. 193 [275 Pac. 503], it is said:

"It is also a general principle that when payment of full legal interest is subject to a contingency so that the lender's profit is wholly or partially put ·in hazard the interest so contingently payable need not be limited to the legal rate, providing the parties are contracting in good faith and without the intent to avoid the statute against usury."

In *Terry Trading Corp.* v. *Barsky*, 210 Cal. 428 [292 Pac. 474], the Supreme Court said:

"The courts will not permit an evasion of the Usury Law by any subterfuge, and it is always permissible to show that a transaction, ostensibly lawful, actually constituted a usu-rious loan and was made with intent to evade the statute. (*Haines* v. *Commercial Mortgage Co.*, 200 Cal. 609, 616 [53

A. L. R. 725, 254 Pac. 956, 255 Pac. 805].) Of course, the mere fact that defendant may have been required to enter into an unprofitable contract as a condition to a loan of money would not itself make the loan usurious. On the other hand, the law would be violated if the lender provided for a lawful rate of interest in the note itself, but required additional and excessive interest by the terms of a collateral agreement. Nor would it make any difference that the additional and excessive amounts of interest were designated as payments for services or materials furnished by the lender or his agent, if they were actually intended as interest. The test is whether there was the intent to evade the law, and the circumstances and negotiations which preceded the transaction may be material in determining such intent. (*Lamb* v. *Herndon,* 97 Cal. App. 193 [275 Pac. 503] ; *Douglass* v. *Boulevard Co. et al.,* 91 Conn. 601 [100 Atl. 1067] ; *Lowenstein & Sons* v. *British-American Mfg. Co.,* 300 Fed. 853; *Clemens* v. *Crane,* 234 Ill. 215 [84 N. E. 884] ; cases collected in notes, 21 A. L. R. 797, 812, and 53 A. L. R. 746; Coffin, Usury in California, 16 Cal. L. Rev. 296, 415, 416, 422.) It is said by the court in *Douglass* v. *Boulevard Co. et al., supra,* at 100 Atl., page 1068, that 'whether such an intention is present is always a question of fact for the jury. No device can be invented and no disguise can be put on which will make a contract valid, if, behind or underneath, an intent to evade the statute is found. It then must follow that every circumstance surrounding or connected with the transaction is material, if in any manner it will reveal the intention of the parties.' And in *Clemens* v. *Crane, supra,* at 84 N. E., page 889, the court said: 'It is the constant practice of courts to resort to extrinsic evidence to determine the question of usury. (2 Jones on Evidence, sec. 441; 1 Elliott on Evidence, sec. 591; *Ferguson* v. *Sutphen,* 3 Gilm. (Ill.) 547; *Reeve* v. *Strawn,* 14 Ill. 94.) Resort to parol evidence in such cases does not in any way depend upon the existence of an ambiguity in the written contract, but it is justified on the ground that the charge of usury raises a question of the legality of the instrument to the extent that usury, under the statute, renders contracts illegal or void.' The authorities leave no doubt as to the right of defendant to have this issue tried. Of course, the burden, and a heavy one, rests upon him to establish the evasion. (*Stark* v. *Bauer Cooperage Co.,* 3 Fed. (2d)

214; *Friedman* v. *Wisconsin Acceptance Corp.*, 192 Wis. 58, [210 N. W. 831, 53 A. L. R. 758].)''

 When we measure the contracts before us by the foregoing rules it is evident that the evidence fully justifies the finding of the trial court that they are not usurious. The question being one of fact this finding is binding upon us and is final here.

Plaintiff was indebted to the extent of $2,000,000, or more. It was necessary to have $250,000 in addition to its bond issue with which to liquidate the portion of its debts it could not refund with the bonds. Its only asset from which it could even hope to pay this indebtedness, which totaled more than $2,000,000, was the Kettleman Hills oil leases. In order to reduce a potential value of the leases to a tangible liquid value so that the indebtedness might be paid it was necessary that the oil, which probably existed under the surface of the ground covered by the leases, be brought to the surface and sold. This required extensive and expensive drilling operations which plaintiff could not prosecute. If the $250,000 loan were repaid there would still remain the much larger bonded debt which, upon foreclosure, would take all of plaintiff's properties. The bond issue could only be paid from oil produced from the leases. It is clear that the major objective of plaintiff in its refinancing operations was the production of oil from its leases. That end was to be accomplished by means of the fifty-fifty drilling contract. In the estimation of both parties this was undoubtedly the document of major importance executed by them. It is true that as part of the same transaction plaintiff was loaned $250,000, drawing interest at six per cent per annum. This money was used to pay labor and other claims that could not be refinanced through the bond issue. It was necessary that these claims be paid to prevent bankruptcy proceedings and without the loan defendants could not have had peaceable and continued possession of the leased property, nor could they have performed the obligations of the leases and the drilling contract. While the loan was a part of the entire transaction it was incidental to the main purpose, that of developing and marketing oil. There was a consideration separate and apart from the loan supporting the drilling contract. Plaintiff assigned its leases to a defendant. Defendants agreed to drill for oil and in so doing would expend large sums of

money which could not be recovered if petroleum products were not found. The consideration for the drilling contract to this extent was entirely separate and distinct from the consideration for the loan. The former did not depend on the latter. Defendants took all the risks incident to the drilling operations and plaintiff took none. The profits to be derived by defendants from the leases assigned to them and from the money expended in the hazardous enterprise of drilling for oil were a recompense for the risk they took in drilling and were perfectly legitimate, as the money expended in drilling could not be recovered if oil were not produced. The leases were not assigned to them as security for the loan nor as a bonus for it, but to permit them to drill, find, and sell oil, and produce money for plaintiff as well as for themselves.

The only interest which defendants could receive for the loan of $250,000 was six per cent per annum, the rate specified in the promissory note, which rate was not usurious. Any other profits accruing to defendants must come under the drilling contract. Such a contract does not come within the terms of the usury law.

Defendants urge that the usury law (Stats. 1919, p. lxxxiii) has been repealed by section 22 of article XX of the Constitution which was adopted November 6, 1934. See *Fenton* v. *Markwell & Co.*, 11 Cal. App. (2d) (Supp.) 755 [52 Pac. (2d) 297]; *Andrews* v. *Reidy*, (Cal. App.) [54 Pac. (2d) 30]; *Andrews* v. *Reidy*, 7 Cal. (2d) 366 [60 Pac. (2d) 832]; *Matulich* v. *Marlo Inv. Co.*, 7 Cal. (2d) 374 [60 Pac. (2d) 842]. As we have concluded that the contracts are not usurious we need not consider this question.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.