[Civ. No. 17187.   Second Dist., Div. One.   Jan. 31, 1950.]

J. HOWARD BATCHELOR et al., Appellants, v. ARTHUR MANDIGO, Respondent.

Macbeth & Ford for Appellants.

J. Henry Schweitzer for Respondent.

WHITE, P. J.—Plaintiffs brought an action to recover treble damages under the Usury Law of this state (Stats. 1919, p. lxxxiii; 2 Deering's Gen. Laws, Act. 3757; Cal. Const., art. XX, § 22), alleging that within one year defendant had taken and received from them interest of $4,801.31 on a loan of $15,000. The trial court, hearing the case without a jury, found that the transaction was not usurious, and judgment was entered that plaintiffs take nothing. Plaintiffs appeal from the judgment and from an order denying their motion to vacate the judgment and enter another and different judgment.

Plaintiffs alleged that "On or about February 5, 1946, in the County of Los Angeles, plaintiffs were obligated by contract to pay $15,000.00 within three days to Douglas Aircraft Company, Inc. Being without liquid assets and having been deserted by certain expected backers, plaintiffs applied to defendant for a loan of $15,000. Defendant immediately made such loan, but in return therefor he exacted from plaintiffs their written agreement to pay him, within one year from February 5, 1946, $20,000.00 plus 5% interest on $15,000.00, and to furnish him the following security for his loan: (a) title to certain surplus war materials; and (b) the note of plaintiff J. Howard Batchelor and his wife, in the sum of $15,000.00 and bearing interest at the rate of 5% per annum, which note should be secured by a deed of trust on the home of plaintiff J. Howard Batchelor and his wife."

The agreement entered into by the parties is as follows:

"J. Howard Batchelor and Leon E. Jurras, co-partners, and doing business under the name of Bajur Hardware Co.,

acknowledge that they have this day received the sum of $15,000.00 from Arthur Mandigo, of Santa Barbara, California, which sum, together with $10,000.00 of co-partnership funds, they will use to purchase certain allotments of surplus war and other materials. The co-partners agree that title to all such materials shall be vested in Arthur Mandigo, and all such materials shall be his property until he shall have received the sum of $20,000.00, and when he shall have received such sum, said Arthur Mandigo shall, by proper assignment, transfer the title to any and all materials remaining unsold as the property of the co-partners.

"The co-partners hereby acknowledge that they have received the materials purchased with the above moneys, and will hold the same for Arthur Mandigo, as follows:

"All materials purchased, save and except paints, varnishes, thinners and other painting materials, shall be stored in a warehouse under the control of the co-partners at 1648-10th Street, Santa Monica, California, for said Arthur Mandigo, and the paints, varnishes, thinners and other painting materials shall be stored in a building under the control of said co-partners at 1206 Grant Street, Santa Monica, California, for said Arthur Mandigo. . . .

"The co-partners shall have the privilege and right of selling any or all of the materials so purchased and stored for said Arthur Mandigo at such prices as they may determine to be proper and profitable, provided, that before any such sale or sales are consummated, they will first serve on Arthur Mandigo, or if he be not available, then his attorney, Thomas J. Dixon, a list of the materials so to be sold, and then and there obtain from said Mandigo or Dixon, as the case may be, a release of the materials so to be sold, and at which time, the co-partners will pay to said Mandigo or Dixon, eighty per cent (80%) of the sales price, the said co-partners retaining the remaining twenty per cent (20%) for operating expenses. When the eighty per cent (80%) of all sales made shall amount to $20,000.00 and shall have been paid to said Mandigo or Dixon, then any and all materials remaining unsold shall become the property of the co-partners as above provided."

The agreement further provided that plaintiff Batchelor and his wife should deliver to defendant their note for $15,000 secured by a trust deed on their home; that defendant should have the right to foreclose the trust deed in the event of a breach of the agreement or if in his opinion plaintiffs were

not diligent in effecting sales; that in the event of plaintiffs' failure to sell sufficient materials to pay defendant the sum of $20,000, defendant at his option might dispose of the materials, apply the proceeds to the payment of sums due him, and hold the plaintiffs for any deficiency. It was further agreed that ''Nothing herein shall be construed as creating or establishing a co-partnership between the co-partners and Arthur Mandigo, it being understood and agreed that said Arthur Mandigo is an independent operator purchasing materials through the co-partners for a profit as herein provided.''

The trial court found as follows:

That the $15,000 paid by defendant to plaintiffs ''was not intended to be a loan, but was entrusted to plaintiffs for the purchase of certain war materials on behalf of the defendant''; that the agreement above set forth ''expressed the true intention and agreement between the parties, and that there were no collateral agreements between the parties with reference to said transaction''; that ''the plaintiffs agreed to purchase from the defendant his interest in said surplus war materials, at future times, at a higher aggregate price as provided in said agreement.''

The court further found: ''That since under the terms of said written agreement the materials purchased for defendant with his funds were not to be segregated from materials purchased with plaintiffs' funds, and since plaintiffs were entrusted with all of the materials so purchased until sales were made or until plaintiffs purchased defendant's interest in said materials for the amount provided in said contract, and since it was impractical to warehouse defendant's property in a bonded warehouse, or otherwise satisfactorily to protect his property pending sale, the plaintiffs voluntarily agreed to execute the note and deed of trust referred to in said agreement to secure and guarantee full and faithful performance of said agreement on their part.''

Appellants contend that the transaction, although evidenced by an instrument denominated ''Warehouse Receipt and Agreement,'' was in truth a loan, and that ''distinctions from a loan are untenable.'' A ''loan'' is defined in *Milans* v. *Credit Discount Co.*, 27 Cal.2d 335, 339 [163 P.2d 869, 165 A.L.R. 621], as ''the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use; and if such be the intent of the parties the transaction will be deemed a loan regardless of its form.''

"This," urged appellants, "precisely describes the present case. Respondent delivered $15,000.00 against appellants' contract to return $20,000.00 as soon as 80% of sales added up to that amount, but in no event more than twelve months after the receipt of the $15,000.00. The mortgage and security-title make the character of the transaction especially clear, since they are the common incidentals of a well-secured loan."

It has long been established that the courts will pierce the veil of any transaction designed as a cloak to cover the exaction of usurious interest. The substance and not the form of the transaction is controlling,—the essence of the transaction rather than its trappings. (See authorities cited in *Milana* v. *Credit Discount Co., supra,* pp. 340, 341.) "No case is to be judged by what the parties appear to be or represent themselves to be doing, but by the transaction as disclosed by the whole evidence, and if from that it is in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money, the parties are subject to the statutory consequences, no matter what device they may have employed to conceal the true character of their dealings." (27 R.C.L. 211.)

Appellants rely heavily upon the Milana case, *supra.* It is to be noted, however, that the court was there dealing with a judgment entered upon the granting of a nonsuit. The plaintiff, in order to keep her business operating, entered into an arrangement with a loan company which purported to be a sale of accounts receivable, which plaintiff guaranteed would be paid within 60 days. However, as stated in the decision, "In practice, accounts not paid within sixty days from assignment, although in some cases accounts were listed which were not yet due, were turned back to the plaintiff and were "repurchased' by the defendants under the same agreement, and an additional discount was taken on the so-called repurchases." The court held that the evidence would support a finding that the sale form was used merely as a cover for the real intent; that the trier of fact could reasonably conclude "that the essense of the agreements was the use by the plaintiff of the funds at prescribed rates of interest which were in excess of the constitutional rate."

The situation with which we are here concerned, however, does not precisely parallel that presented in the many cases in which it has been held that the form of the transaction, or the label which the parties put on it, was but a subterfuge to conceal a usurious loan. The facts in the present cause are

that plaintiffs had an opportunity to purchase surplus materials which they hoped to resell at a profit. They were not borrowing money in order to keep their business going, as was the situation in the Milana case, *supra*, nor did the transaction take the form of a purported sale of property owned by them with an agreement to repurchase, to cover what was in fact a pledge to secure a loan. The distinction between the situation presented by a purported sale to the creditor of property owned by the debtor and that of a "sale and resale between different persons" is illustrated in the annotation in 154 American Law Reports, pages 1063, 1079, 1080, which quotes extensively from the case of *Stark* v. *Bauer Cooperage Co.* (1925, C.C.A. 6th), 3 F.2d 214 (*cert. den.,* 267 U.S. 604 [45 S.Ct. 464, 69 L.Ed. 809]), which quotations we adopt as peculiarly appropriate to the case before us, as follows:

"An impecunious but optimistic speculator, who finds a property for sale at such a bargain price that he sees a profit of 200 per cent if he could buy it and hold it awhile, hurries to a moneyed friend, explains the situation, and says, 'If you will buy this from the present owner, and then sell it to me on five years' credit, I will buy it of you at an advance of one third over what you pay, and make my interest-bearing purchase contract and notes for that total sum.' The friend agrees, and it is done. Later the buyer concludes that the transaction was a usurious loan to him.

" . . . . . . . . . . .

"So far as we can find, every case in which the existence of an absolute promise by an ostensible vendee to pay the sum involved has been thought to indicate that the transaction was merely a loan instead of having the character in which it was made to appear is a case where the contract vendee had parted with his recent title and was arranging to get it back again. In no case was the contract one for the purchase of property which he had never theretofore owned. In this class are the numerous cases in which it appeared that the owner, perhaps of real estate or perhaps of the accounts receivable in a going business, was hard pressed for funds to save or to benefit his property, and thereupon went through more or less complete forms of selling his property to another and simultaneously agreed to buy it back at an advanced price. It is not important whether the papers show on their face that this agreement for a repurchase exists or whether that is shown by parol; in either case, in construing the contract, it has seemed that the

capital advanced was really a loan secured by the property conveyed, and the capital-recipient's absolute obligation to repay has cut a figure in bringing this conclusion; non constat that the same rule applies when the first and only conveyance is a contract of sale from the one who has furnished the capital and running to a stranger, or when at the beginning of negotiations, the final contract vendee does not own the property, but covets it, and is not hard pressed but avaricious."

(See, also, *Austermuhl* v. *Wotton*, 120 Wash. 376 [207 P. 662]; *Eames* v. *Hardin*, 111 Ill. 634; *Powers* v. *Walrath*, 235 Ill.App. 180.)

■ Appellants place stress on the fact that respondent took no risk, but required ample security for the return of his investment and profit in the form of the personal obligations of the appellants and a deed of trust on the home of appellant Batchelor. While these facts are of importance, and perhaps determinative in many types of cases, they are not controlling here. (See authorities immediately above cited.) The language appearing in 154 American Law Reports, page 1081, in discussing the case of *Stark* v. *Bauer Cooperage Co., supra*, is here pertinent: "After pointing out that on both sides the parties were men of large affairs and highly competent to deal at arm's length, and that 'plainly he who would transform this contract into some different one, supposed to be hidden in all these plain terms, carries a heavy burden,' the court said that the transaction, 'in a fair sense, though not in the most common one,' was a joint adventure, B. to furnish the present opportunity and future management for making a large profit, M. to furnish the capital. Rejecting the apprehension of B's counsel and of the court below that if the contract was allowed to stand as written, a highway would be pointed out to evade the beneficent purpose of the usury law, the court concluded: 'When the capitalist and speculator have no existing relations and the speculator has no interest in a property for sale, the agreement that the capitalist will buy the property and carry it for the other and that the speculator will buy it from him at a fixed price is not, ipso facto, a loan.' "

■ The learned trial judge, in denying a motion to enter another and different judgment, rendered a memorandum decision which in our view effectively disposes of the contention that the transaction was in its essence a loan, and from which we quote in part:

"In the instant case we have a plaintiff who was operating a business out of which he gained an apparently adequate livelihood. There is no evidence that he needed any funds for the operation of the enterprise which was his normal occupation. He saw an opportunity to engage in a new, additional and speculative venture, wholly unassociated with his regular business.

"To obtain the goods for the new speculative venture, for which he had part but not all of the means, he accepted the financial interest of the defendant. Neither the expectancy of a high percentage of profit by both the plaintiff and defendant, nor the fact that the defendant was secure against possible losses, nor the fact that the defendant was to receive the return of his investment (which was larger than the investment of the plaintiff) before the plaintiff obtained his anticipated profit, can change this business relationship into a loan transaction.

" . . . . . . . . . . .

"The rule set forth in 55 Am.Jur. 342 does indicate to the court a reasonable line of demarkation between a legitimate business venture with the parties unequal in the extent of their risk but equally eager in their anticipation of profit, and a situation in which a necessitous borrower is victimized by a designing usurious lender. It is there suggested that a transaction is likely to be a loan where the recipient of the money parts with title to *property of his own* as security. On the other hand, the transaction is more likely to be a business venture where the money is used entirely for the purchase of *property not theretofore owned by either* of the persons.

" . . . . . . . . . . .

"In the instant case, the plaintiff did not desire nor require the use of *money* as such. The parties desired, and did, acquire *property*. Had plaintiff used any part of the money entrusted to him by the defendant for any purpose other than the acquisition of the goods from Douglas he would have violated a trust . . ."

The judgment and order appealed from are, and each is, affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied February 17, 1950, and appellants' petition for a hearing by the Supreme Court was denied March 30, 1950. Carter, J., voted for a hearing.