[Civ. No. 26192. Second Dist., Div. Two. Feb. 19, 1963.]

ELLIS G. WOOTON et al., Plaintiffs and Appellants, v. RICHARD F. COERBER et al., Defendants and Respondents.

Schwabacher, Cosgrove & Beaudet and Thomas J. Beaudet for Plaintiffs and Appellants.

Jess F. High for Defendants and Respondents.

HERNDON, J.—This appeal is taken by plaintiffs from a judgment entered in favor of defendants after a nonjury trial wherein plaintiffs sought to recover treble damages for alleged usurious interest charges. As their grounds for urging a reversal, appellants argue that the evidence is insufficient to support the trial court's findings: (1) that the money advanced by respondents was their contribution to a joint venture involving the purchase of real estate, and not a loan;

(2) that respondents held an option to purchase the real estate involved; and (3) that "there was an accord and satisfaction by and between the plaintiffs and the defendants on or about December 9, 1958."

■■ As recently stated in *Gruner* v. *Barber,* 207 Cal. App.2d 54, at page 57 [24 Cal.Rptr. 292] : "We find ourselves immediately presented with the oft-repeated and time-honored rule that when a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. (*Brewer* v. *Simpson,* 53 Cal.2d 567 [2 Cal.Rptr. 609, 349 P.2d 289].)"

■ In *Giorgi* v. *Conradi,* 199 Cal.App.2d 82 [18 Cal. Rptr. 588], the last quoted rule was restated and its application in a case involving an allegedly usurious transaction was stated as follows at page 85 : "Whether a business transaction is usurious depends on its own facts. The presumptions are that such transactions have been fair, regular and legal (Code Civ. Proc., § 1963, subds. 19 and 33; *Hersum* v. *Latham,* 120 Cal.App.2d 325, 328 [260 P.2d 988] ; *Stafford-Lewis* v. *Wain, supra,* [128 Cal.App.2d 614 (276 P.2d 157)], at pp. 620 and 621). ■ It is a question of fact as to whether a particular transaction is or is not usurious (*Wheeler* v. *Superior Mortgage Co.,* 196 Cal.App.2d 822, 829 [17 Cal.Rptr. 291]). ■ Where, as here, the form of the transaction makes it appear that to be nonusurious, it is for the trier of fact to determine whether the intent of the parties was that disclosed by the form adopted, or whether such form was a mere sham and subterfuge to cover up a usurious transaction (*Janisse* v. *Winston Investment Co.,* 154 Cal.App. 2d 580, 582 [317 P.2d 48, 67 A.L.R.2d 225]). ■ The burden is upon the one who charges the extraction of usurious interest to prove his charges by a preponderance of the evidence (*Advance Industrial Finance Co.* v. *Western Equities, Inc.,* 173 Cal.App.2d 420, 428 [343 P.2d 408] ; *Sharp* v. *Mortgage Securities Corp.,* 215 Cal. 287 [9 P.2d 819])."

In the instant case, the facts relating to the transactions between the parties were essentially uncontradicted, so that the problem of the trial judge was to decide what were the

more reasonable inferences to be drawn from those facts. ██ ██ Prior to October 17, 1957, appellants had entered into a transaction wherein they had undertaken to purchase certain property for approximately $53,000. It is not clear from the record whether they were to pay $15,000 or $16,000 down; but, in either event, after the down payment was placed in escrow, they were to assume an existing encumbrance of over $37,000. They were convinced that if they could acquire title they would be able to make a very substantial profit by a quick resale. However, they found themselves unable to put more than $500 into the escrow. They were faced with the necessity of finding someone to advance the remainder of the required down payment or they would suffer a complete forfeiture of their rights.

Through the agency of a so-called "finder," respondents, who are husband and wife, were contacted by appellants and some preliminary negotiations were had concerning their putting up the required capital and coming into the transaction as full partners or as coequal joint venturers on a percentage basis. No actual percentages were ever agreed upon because respondents, apparently for tax reasons, felt that they could not await the full consummation of a resale, which would doubtless entail the taking of second trust deeds, before they realized a return of their investment.

On October 17, 1957, by adapting and modifying a standard form of "Sale Escrow Instructions" to the point where it was rendered practically unintelligible, the parties arrived at a highly ambiguous agreement. It was provided therein that respondents, who were sometimes referred to as "lenders," were to pay $15,500 into an escrow created for the purpose of effectuating this transaction. The escrow agent was authorized immediately to transfer this money into the escrow previously set up to handle appellants' purchase of the real property involved.

Appellants, on their part, were to pay to respondents via this *new* escrow the $15,500 invested by the latter, plus $1,550 cash and an assignment of a $2,500 third-party note secured by a second trust deed on other property. Further, appellants were to give respondents their own note for the $17,050 payment provided for, said note being made payable on or before January 2, 1958, and secured by a second trust deed covering the property being purchased.

Finally, there was to be deposited in this escrow a grant deed vesting in respondents the title to the real property

which was being purchased. The escrow company was authorized to record this deed on January 3, 1958, if the $17,050 payment to respondents had not been made in full. It appears to have been understood by all concerned that appellants hoped for a quick resale of the property wherein the down payment would produce sufficient cash to enable them to make the repayment required by respondents' investment on or before the specified date.

Appellants argue that the terms of the hopelessly ambiguous ''Sale Escrow Instructions,'' and certain testimony of the parties to the effect that respondents did not wish to go into the deal as *full* partners, or as *coequal* joint venturers, lead inescapably to the conclusion that respondents loaned appellants $15,500 for a period of less than ninety days with ''interest'' in the amount of $1,550 cash and a third-party note in the face amount of $2,500.

Respondents contend, on the contrary, that it is clear from the evidence that the parties intended to combine in a joint venture involving the purchase and sale of real estate and that respondents, who were advancing practically all the capital, had chosen to take their profit in a fixed amount from the anticipated down payment immediately upon a resale rather than from the much larger profit which might be realized upon final completion of the expected resale.

Actually, there is nothing entirely ''clear'' as to the intentions of the parties with reference to the precise legal nature of their relationship, but the trial court chose to accept the interpretation urged by respondents. Certainly we cannot say that the trial court's interpretation and the inferences which it drew from the evidence were not the more reasonable. Appellants presently assert that their liability under the note and trust deed was absolute and that the placing in escrow of the deed conveying the property to respondents amounted to an invalid restraint upon their redemption rights in violation of section 2889 of the Civil Code.* Respondents contend, however, that not only did they put up all the capital, but that they took all the risks, for if the speculative resale had failed to materialize, appellants would have been under no obligation to repay them anything and they would have been left holding an unmarketable tract of

---

*Civil Code, section 2889, provides: 'All contracts for the forfeiture of property subject to a lien in satisfaction of the obligation secured thereby, and all contracts in restraint of the right of redemption from a lien, are void.''

desert land bound by the obligation to make the payments on the existing $37,000 encumbrance. A cynical reader of the record might suspect that if the resale actually had failed of materialization instead of having beeen consummated at a price of $97,876, the contentions of the parties might now be reversed.

In any event, as we have shown, the trial court's finding that the instant transaction *"was a venture in real estate and not a loan"* is amply supported by the evidence. As stated in 49 Cal.Jur.2d, Usury, section 63, page 735: "The advancing of money as a hazardous investment in an enterprise must be distinguished from the advancing of money as a loan, and the former is outside the purview of the usury law." Reference is made to the following additional authorities which contain discussion showing the sufficiency of the admitted facts of the instant case to support the trial court's finding that the transaction here involved was not a loan: *Brown* v. *Lamb,* 83 Cal.App. 187 [256 P. 825]; *Lamb* v. *Herndon,* 97 Cal.App. 193 [275 P. 503]; *Jameson* v. *Warren,* 91 Cal.App. 590 [267 P. 372]; Witkin's Summary of California Law (7th ed.) volume 1, page 184-185; 55 Am. Jur., Usury, section 32, page 347; 91 C.J.S., Usury, section 25, page 599; 6 Williston on Contracts (rev. ed.) section 1692, page 4786; Restatement of the Law on Contracts, section 527, page 1024, and comment (a) thereon.

 It appears to us that the most reasonable inference from the evidence is that which was drawn by the trial court, namely, that the basic understanding of the parties was that respondents were to have a limited share of the profits if an immediate resale were consummated, but would acquire complete ownership of the property if it failed.

 It is probable, too, that the trial court in its deliberations was impressed with the fact that society's usury laws were designed primarily to protect the indigent, who are helpless to protect themselves in a practical sense, and were not intended to regulate the *inter se* free bargaining between speculators. "Such laws are intended as a bulwark to protect the needy from the greed of the rapacious. It is the theory of such enactments that those in distress might be plunged into deeper distress if the law did not come to their relief and protect them from the money lender, who would prey upon misfortune and wring from the needy borrower, in his endeavor to tide over present difficulty, the utmost farthing as compensation for what is often an evanescent benefit—mere-

ly the putting off of an evil day.'' (*In re Washer,* 78 Cal. App. 759, 771-772 [248 P. 1068].)

In the instant case, appellants, who concede that they are speculators in real estate and that the property here involved was one such speculation, were neither needy nor in distress —excepting, of course, such distress as may have been caused by the thought of losing a ''quick'' profit. If they were unable to find someone with the capital to risk in their venture, they stood to lose nothing they presently owned but would merely be unable to exercise the potentially lucrative option they had obtained. When respondents declined to join in a full joint venture, the parties struck a bargain which, in practical effect, called for respondents to purchase the land from the third party owner subject to the right of appellants to repurchase it within a certain period.

The language adopted by the court in *Batchelor* v. *Mandigo,* 95 Cal.App.2d 816, 821 [213 P.2d 762], is equally apt here: '' 'An impecunious but optimistic speculator, who finds a property for sale at such a bargain price that he sees a profit of 200 per cent if he could buy it and hold it awhile, hurries to a moneyed friend, explains the situation, and says, ''If you will buy this from the present owner, and then sell it to me on five years' credit, I will buy it of you at an advance of one third over what you pay, and make my interest-bearing purchase contract and notes for that total sum.'' The friend agrees, and it is done. Later the buyer concludes that the transaction was a usurious loan to him.' '' This type of transaction was then distinguished from the situation where the hard-pressed owner of property or a business goes through the form of a sale thereof with option to repurchase at an increased price that would result in a violation of the usury law if the transaction was merely a disguised loan. The rule that would be applicable in this situation would not apply ''. . . when at the beginning of negotiations, the final contract vendee does not own the property, but covets it, and is not hard pressed but avaricious.''

The court in *Batchelor* v. *Mandigo, supra,* at page 822, also found the following language pertinent: '' '. . . the transaction, ''in a fair sense, though not in the most common one,'' was a joint adventure, B. to furnish the present opportunity and future management for making a large profit, M. to furnish the capital. . . . ''When the capitalist and speculator have no existing relations and the speculator has no interest in a property for sale, the agreement that the capital-

ist will buy the property and carry it for the other and that the speculator will buy it from him at a fixed price is not, ipso facto, a loan." ' " .

Although in the instant case respondents never acquired title to the purchased property in their own name, it was a fair inference from the evidence that the parties intended to create this situation, particularly when appellants found they were unable to meet the agreed payment on respondents' investment by January 2, 1958, whereupon the grant deed transferring title to respondents was to be recorded. To permit appellants to avoid the consequences of the bargain (which their own testimony indicates they believed had been made) would not be in accord with the beneficent intendment of the usury laws.

"The usury law is to be used as a shield and not as a sword." (*Haines* v. *Commercial Mortgage Co.*, 200 Cal. 609, 621 [254 P. 956, 255 P. 805, 53 A.L.R. 725].) "The Usury Act is intended to prevent the charge of an excessive rate of interest, and may not be used as an engine to perpetrate an injustice." (*Van Noy* v. *Goldberg*, 98 Cal.App. 604, 609 [277 P. 538].)

The language of the court in the case of *Ambrose* v. *Alioto*, 65 Cal.App.2d 362, 367 [150 P.2d 502], is also appropriate here: "In a very real sense Ambrose was hazarding his investment on the success of the enterprise and was to receive a share in the earnings of the boat, and finally and possibly in the boat itself, rather than any interest on his investment or any flat obligation to repay the same. . . . 'When the whole sum advanced is put in hazard—as where one advances money under a contract that may be satisfied by delivery of property of uncertain or speculative value or the payment of an increased amount by a specified date—the amount to be repaid may be considered a price set for the surrender of an investment, rather than a usurious loan.' " (See also *Lindsey* v. *Campbell*, 132 Cal.App.2d 746, 751 [282 P.2d 948].)

The criteria for determining whether a transaction is a loan or a joint investment as set forth in the *Batchelor* v. *Mandigo* case, *supra*, were recently reaffirmed in *Giorgi* v. *Conradi*, *supra*, 199 Cal.App.2d 82, 86: " ' "The rule set forth in 55 Am.Jur. 342 does indicate to the court a reasonable line of demarcation between a legitimate business venture with the parties unequal in the extent of their risk but equally eager in their anticipation of profit, and a situation

in which a necessitous borrower is victimized by a designing usurious lender. It is there suggested that a transaction is likely to be a loan where the recipient of the money parts with title to *property of his own* as security. On the other hand, the transaction is more likely to be a business venture where the money is used entirely for the purchase of property not theretofore owned by either of the persons." ' The uncontroverted evidence established that the plaintiffs *did not become the owners of the property until after the* consummation of the transaction, and that Giorgi exercised his option by the payment of $1,000. Giorgi testified that he was interested only in acquiring the land, not in merely borrowing money. . . ."

The trial court appears to have been amply justified in finding that the same basic type of transaction was involved in the instant case. Thus, Mr. Rough, an attorney who acted as the "finder" and appears to have casually advised both parties throughout this transaction, testified: ". . . I asked [appellant Wooton], inasmuch as I was going to put this up to some friends or clients, that I said, 'What will happen if you don't resell this property? Have you fellows got the money to pay this back in this short time? $15,000 means quite a bit of money'—at that time, in '57, when money was rather tight. And [he] said, 'Well, no, I don't think we have the cash to pay it back, but we will put up a deed in escrow to whoever loans the money, and if we don't make a resale of this property between now and January 1st, 1958, the escrow will be instructed to record that deed, and whoever puts up the money will get this property at what we are paying for it, $115 an acre, which he is a cinch to make—resell it at a handsome profit.' "

Appellant Wooton himself testified: "Q. Then instead of [Mr. Coerber] sharing without limitation in profits, you eventually decided to limit it to just a portion of the down payment which might be received? The Witness: That is a difficult question to answer whether yes or no, because obviously whatever moneys he got was out of the—out of the profits, one way or the other, or down payment, but there was a limitation on it, that is true. Mr. High: Q. Outside of this exception that you have noted, then, was Mr. Rough's testimony substantially correct? A. I will say yes."

Appellant Sparks testified that the testimony of Mr. Rough and appellant Wooton was correct, but pointed out that the

money advanced by Coerber could have been repaid from any source and was not restricted to funds received from the resale. However, he stated: "Q. It is a fact that if the money was not paid out of the sale of the property, [respondent Coerber] was to have the property, and the deed was given pursuant to that? A. This is correct." He later indicated that he did not mean to restrict the source of the payment to the resale, but never denied that in the event of default respondents were to become the owners of the property.

However, as the determinative date of January 2, 1958, drew closer, it became clear to appellants that they would be unable to make their required payment by that date. Negotiations were then had concerning an extension of time. As a result thereof, an amendment dated December 16, 1957, was placed in the escrow extending the time limit thereof to March 2, 1958. It was further provided in this amendment that the assignment of the third-party note for $2,500 would be delivered to respondents on January 2, 1958, and that the escrow company would pay to respondents 2 per cent of the gross sales price of the property involved.

In this connection Mr. Rough (whose testimony appellants agreed to be correct) stated in regard to this transaction: ". . . Ellis Wooton called me and said that, 'We are having some trouble and we are just faced with another delay, and we got to ask Coerber for an extension, and have you got any—what do you think? Have you got any suggestions how we can handle it?' And, as I recall, my response was that, 'Well, I think, Ellis, that if you have got to keep extending this deal, and *in view of the fact that Coerber can take this land at any time away from you,* in which you have got obviously good prospects for a nice profit, I think that you should sweeten Coerber up with *some additional share of the profits* or a consideration for this extension.' I never worked out the details. Wooton and Coerber worked that out between themselves." (Italics added.)

Appellants urge that since the ultimate resale price of the property was $97,876, this provision for an additional payment to respondents in the amount of $1,957.52 was usurious in and of itself. In other words, appellants argue that since an agreement to forbear enforcement of a note in consideration for a usurious payment is usury regardless of the original validity of the note (*Aitken* v. *Southwest Finance Corp.,* 131 Cal.App. 95, 104 [20 P.2d 1000]), the requirement that they

pay $1,957.52 for a 60-day extension of a $17,050 note was usurious.

On the other hand, respondents contend that although appellants could have paid them off from any source prior to January 2, 1958, it was clearly intended that if appellants failed to make the required payment, respondents would become the owners of the property. Therefore, the promised 2 per cent of some unknown and speculative future profit was really no consideration at all, for if appellants failed to perform by January 2, 1958, respondents, as owners, were entitled to 100 per cent of any potential future profits. Further, appellants were under no obligation to pay even this uncertain sum, but could still walk away from the deal leaving respondents holding the land if it proved to be unmarketable at a profit.

In either event, as the new date of March 2, 1958, approached and the resale had not been completed, appellants desired still another extension. Therefore, on February 28, 1958, a further amendment was placed into the escrow extending the time limit to April 2, 1958, provided appellants paid in $5,000 by March 4, 1958. This sum was to be turned over to respondents and applied on the $17,050 note. This was done and a balance of $12,050 remained due and payable on April 2, 1958.

As heretofore indicated, the parties' written agreement was so ambiguous that either side might with some logic have selected and argued for alternative and opposing interpretations dependent upon the outcome of the anticipated efforts to effect a resale of the property. Originally, appellants seem to have enjoyed the more favored position, for they stood to make a remarkably substantial profit upon an actual cash outlay of only $250 each. However, in order to gain their first extension of time, they were required to part with a note in the face amount of $2,500. To gain their second extension of time, a payment of $5,000 was required. By April 2, 1958, the resale apparently was practically assured and respondents evidently decided to assert their rights.

On April 2, 1958, appellants had deposited only $10,000 into the escrow, but respondents were promised that the full balance would be on deposit by 10 a.m. the following day. However, when respondent Coerber arrived that afternoon, it had not been deposited. Although he was advised later that afternoon that it was then available, he declined to proceed with the transaction. Whether respondents had the

legal and equitable right to take title to the property and completely cut off appellants' rights because of the latter's default of April 2, 1958, may be debatable, but it cannot be doubted that both the parties and Mr. Rough believed that respondents possessed at least a justiciable basis for their asserted position.

It was in the light of these circumstances that the parties agreed that respondents were to receive certain notes and trust deeds of the face value of $3,775. Subsequently, the parties made various further amendments to their agreement which finally culminated on December 11, 1958, in respondents receiving the agreed amount of cash and six notes in the face amount of $925 each in lieu of the two earlier notes totalling $3,775 and in payment of the 2 per cent share of the gross sales price. Appellants asserted no claim of usury prior to the closing date. Clearly this settlement was a valid accord and satisfaction of the disputed and conflicting claims of the parties. (Civ. Code, §§ 1521, 1523.)

The judgment is affirmed.

Fox, P. J., concurred.

ASHBURN, J.—I concur in the judgment because the evidence discloses room for the trial judge's conclusion that the instant transaction was not usurious. But I would add a few observations designed to define the exact legal basis upon which his judgment may be sustained.

The record reflects all the indicia of an usurious loan. Defendant Coerber rejected a joint venture or partnership and the parties on October 17, 1957, entered into a deal which involved Coerber's[1] advancing upon plaintiffs' promissory note for $17,050, the $15,500 necessary to enable them to complete the purchase of 480 acres of land which they had an option to buy for $115 an acre, assuming a first trust deed of some $37,000; plaintiffs had $500 invested and were unable to complete or advance any further money upon the down payment of $15,500; the note, signed by plaintiffs, was to be in the principal sum of $17,050, secured by a second trust deed upon the land to be acquired and payable in full on January 2, 1958; in addition, defendant was to receive a $2,500 note of a third person which was secured by a second trust deed upon certain other land. Also a grant deed cover-

[1]As used herein the word "defendant" or "defendants" applies to both Mr. and Mrs. Coerber.

ing the property to be acquired and running in favor of the Coerbers was to be placed in escrow with instructions to deliver same to defendants if the $17,050 note was not paid by January 2, 1958.

The papers and money were passed through escrow but plaintiffs were unable to meet the note at maturity; defendant was in position to require a recording of the grant deed and thus to acquire title in himself. Foreseeing this, plaintiffs obtained from defendant an extension of time until March 2, 1958, upon condition that the $2,500 trust deed and note be delivered to him on January 2, 1958, and that he also receive 2 per cent of the gross sales price of the property when resold.

On February 28, 1958, plaintiffs were still unable to perform and so they procured from defendant an extension of time to April 2, 1958, upon condition that $5,000 be paid upon the $17,050 note by March 4, 1958. This payment was made and the loan thus reduced to $12,050.

By April 2d a resale of the property for $97,876 was practically assured and $10,000 had been paid into the escrow for defendants' benefit, but the remaining $2,050 was not there (due to physical delays in transmission of the money) and defendant did not accept it when advised that it would be in escrow on the following morning nor after he knew that this had been accomplished. He then demanded "a bigger share of the profits" and it was agreed that he should have an assignment of two trust deeds totaling $3,775 face value as consideration for his not demanding immediate recording of the grant deed which the escrow holder still had in its possession. For some reason this did not work out and six other trust deeds for $925 each were substituted by mutual agreement and the resale escrow was closed.

Defendant received for use of his original loan of $15,500 the payment of $5,000 in cash, payment of the balance of the note in full, which included a $1,550 bonus, a second trust deed and note for $2,500, assignment of six notes for $925 each, and an additional cash payment of $182.50. Plaintiffs claim to have thus paid defendant for use of his money the sum of $9,011.50 in excess of the legal rate of 10 per cent. For present purposes the figure may be accepted as correct.

All parties to this action clearly considered and treated the $15,500 advanced by defendant as a loan, and it is patent that the amount actually received by defendant greatly ex-

ceeded the legal rate of interest if the transaction be treated merely as a loan. But it had in it one element, not heretofore mentioned, which justified the trial judge in treating it as a contingent and hazardous venture such as to remove the loan feature from the operation of the usury law.

Restatement of the Law of Contracts, section 527, at page 1024, and comment (a) thereon, are as follows: "A promise, made as the consideration for a loan or for extending the maturity of a pecuniary debt, to give the creditor a greater profit than the highest permissible rate of interest upon the occurrence of a condition, is not usurious if the repayment promised on failure of the condition to occur is materially less than the amount of the loan or debt with the highest permissible interest, unless a transaction is given this form as a colorable device to obtain a greater profit than is permissible. In that case it is usurious.

"Comment: a. Usury laws do not forbid the taking of business chances in the employment of money. A creditor who takes the chance of losing all or part of the sum to which he would be entitled if he bargained for the return of his money with the highest permissible rate of interest is allowed to contract for greater profit. On the other hand it is not permissible to use this form of contract as a device for obtaining usurious profit. If the probability of the occurrence of the contingency on which diminished payment is promised is remote, or if the diminution should the contingency occur is slight as compared with the possible profit to be obtained if the contingency does not occur, the transaction is presumably usurious."

6 Williston on Contracts (rev. ed.), section 1692, page 4786: "It is not usury to advance money which is to be repayable only on a contingency, even though the sum that will be repaid if the contingency happens exceeds the amount loaned with legal interest, if the transaction is genuine and not used as a mere cover to carry out a usurious intent."

55 Am. Jur., section 32, page 347: "To constitute usury it is essential that the sum loaned shall be repayable absolutely; if it is payable only upon some contingency, then the transaction is not usurious, although to satisfy this requisite it is not necessary that the borrower assume personal liability for the loan. However, the rule that if the principal sum is repayable only upon some contingency, then the transaction is not usurious, is not applicable where the contingency selected is so improbable as to convince the court or the jury

that there was no real hazard and that the repayment of the loan was made subject to an improbable contingency merely to escape the statute against usury. Where such is the case, the transaction will be treated as usurious.''

91 C.J.S., section 25, page 599: ''Where the principal sum lent or any part thereof is put in hazard, the lender may lawfully require for the risk incurred as large a sum as may be agreed on in good faith. When, for any cause whatever, the principal sum lent or any part thereof is put in hazard, the lender may lawfully require for the risk incurred as large a sum as may be agreed on in good faith. . . . When the loan is absolutely repayable and only the security for its repayment is at hazard, an interest charge in excess of legal rates is usurious.''

This settled rule of law has been accepted and applied in this state. 49 Cal. Jur.2d, section 63, page 735: ''The advancing of money as a hazardous investment in an enterprise must be distinguished from the advancing of money as a loan, and the former is outside the purview of the usury law.'' 1 Witkin, Summary of California Law (7th ed.) section 170, page 185: ''(5) *Principal Payment Contingent.* Where the *principal sum* is subject to business hazards, and repayment of the loan is subject to the contingency of profits being earned, there is no usury. [Citations.]

''(6) *Interest Payment Contingent.* Where the payment of the full legal interest or any part of it is subject to a contingency, so that the lender's lawful profit is wholly or partially put in hazard, the interest need not be limited to the legal rate, if the parties are contracting in good faith and without intent to evade the usury law.''

To the same effect, see *Lamb* v. *Herndon,* 97 Cal.App. 193, 201 [275 P. 503]; *Miley Petr. Corp., Ltd.* v. *Amerada Petr. Corp.,* 18 Cal.App.2d 182, 188-189 [63 P.2d 1210]; *Ambrose* v. *Alioto,* 65 Cal.App.2d 362, 367 [150 P.2d 502] (hearing denied); *Calimpco, Inc.* v. *Warden,* 100 Cal.App.2d 429, 442 [224 P.2d 421] (hearing denied); *Hersum* v. *Latham,* 120 Cal.App.2d 325, 328 [260 P.2d 988]; *Abbot* v. *Stevens,* 133 Cal.App.2d 242, 247 [284 P.2d 159]; *Schiff* v. *Pruitt,* 144 Cal.App.2d 493, 498-499 [301 P.2d 446]; *Whittemore Homes. Inv.* v. *Fleishman,* 190 Cal.App.2d 554, 557 [12 Cal.Rptr. 235] (hearing denied).

*Martin* v. *Ajax Construction Co.,* 124 Cal.App.2d 425 [269 P.2d 132] (decided by this division of this court), is not opposed to these authorities, being distinguishable upon its facts.

It appears that the two plaintiffs had invested $250 each in the deal for purchase of the 480 acres at $115 per acre, or a total of $55,200; they were nearing a deadline on the down payment of $15,500 and had no money to meet it. Plaintiff Wooton contacted attorney John Rough, explained his predicament and offered to give to an "angel" who would furnish the down payment a cut in the deal or repayment of the $15,500 plus a share of the down payment amounting to $1,550. He told Rough that he and Sparks did not have the money to repay the $15,000 within the short time he had in mind, by January 1, 1958, and " 'we will put up a deed in escrow to whoever loans the money, and if we don't make a resale of this property between now and January 1st, 1958, the escrow will be instructed to record that deed, and whoever puts up the money will then get this property at what we are paying for it, $115 an acre, which he is a cinch to make—resell it at a handsome profit.' " Rough knew that Coerber had money on hand and "had been looking at some property up in that area, and I knew it was at a higher price, a considerably higher price, than that, that he was looking at, so I thought that this would interest him," said Rough in his deposition.[2] He told Coerber about the matter and the latter said that it sounded interesting. Rough further testified that Coerber "had been looking at land in that area and knew that land had been selling at around $200 or better an acre up there, so on 480 acres, he figured it was going to be a pretty nice profit in it." On the following day Wooton and Rough took defendant to see the property. On the way back Wooton asked him how he felt about it and was told " 'Well, I am interested, and I think maybe I'd like to have a part of the deal.' " But nothing was concluded at that time, for defendant did not relish the idea of having his money tied up in a joint venture or partnership until the land had been resold and hence he finally rejected any such arrangement. Wooton testified that on the way back from the visit to the property he asked defendant if he preferred a joint venture, "but he declined, said no, he'd prefer just to make the outright loan." So plaintiffs later offered defendant the $2,500 note which, as viewed by him, "was more a come-on so that I would enter the deal without being actually a third partner in it." And the deal was made upon the basis above outlined, namely, defendant advanced through

---

[2] All depositions were received in evidence.

escrow the $15,500 to cover the down payment, received the $17,050 note of Wooton and Sparks secured by a second trust deed on the property, and also received the $2,500 note and trust deed upon another parcel. At this point the element of hazard took over.

Wooton and Sparks had no money to complete the down payment when the original deal was made or at the time of making extensions on or about January 2, March 2, and April 2. Their signatures upon the trust deed note were worthless even if it be conceded that enforcement of same could result in a deficiency judgment, which assumption seems contrary to the terms of section 580d, Code of Civil Procedure.[3] Indeed, Coerber's remedy for nonperformance of the note, as shown by conduct of the parties, was recordation of the grant deed in his favor which was held in escrow for delivery to him, and that meant that he would get the land and the land only upon payment of all sums due and performance of other terms of the agreement which Wooton and Sparks had made for purchase of the property; and should that happen the return of his $15,500 would be contingent upon his ability to resell the land at cost to him or a better price. To repeat, the original contingency lay in the possibility of plaintiffs making a quick sale at a profit (they had had several deals to fall through), failing which defendant could acquire only the land with its attendant burdens; once that had happened, return of his money (however much it might be) was subject to the further contingency that he could sooner or later turn the property at a price which would clear his books or yield him some profit. Clearly, respondents' money was advanced into a hazardous venture, and its repayment was subject to definite contingencies which eliminated what appeared on its face to be the definite obligation for repayment at a specified time and without condition.

I conclude that the trial judge was justified in holding (impliedly) that the deal was contingent and hazardous from the beginning, was not made in bad faith, and that the usury law is inapplicable.

For these reasons I concur in the judgment of affirmance.

[3]Code Civ. Proc., § 580d: ''No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property hereafter executed in any case in which the real property has been sold by the mortgagee or trustee under power of sale contained in such a mortgage or deed of trust. . . .''