[Civ. No. 14356. First Dist., Div. One. Nov. 15, 1950.]

CALIMPCO, INC. (a Corporation) et al., Plaintiffs and Appellants, v. CARL WARDEN et al., Defendants and Appellants.

Hoffman, Davis & Martin for Plaintiffs and Appellants.

John F. O'Sullivan, Frank J. Perry, Fitzgerald, Abbott & Beardsley for Defendants and Appellants.

BRAY, J.—In an action to recover the statutory penalty for usury, tried without a jury, plaintiffs recovered judgment in specific amounts against each defendant, excepting defendants Luther Warda, Louis Mazzera, doing business as G. Mazzera Building Materials Company and Arco Building Company. Judgment for costs against plaintiffs was given in favor of these last mentioned defendants. Plaintiffs appealed from the

judgment in favor of said defendants, and also from that portion of the judgment denying plaintiffs, as against all the other defendants, the amounts sued for in excess of the amounts awarded. All these defendants appealed from the judgments awarded plaintiffs as against them, respectively. Subsequently the appeals of Frank G. Norman and F. G. Norman & Sons were dismissed.

## QUESTIONS PRESENTED

The main question presented by the defendants' appeals is the basic one of whether the contract in dispute was usurious. In addition, certain defendants raise other questions peculiar to them which will be considered later. Plaintiffs' appeal is based on the finding that the contract was usurious, and raises the contention that the amounts awarded them because of the usury were not sufficient. Plaintiffs' appeal is on the judgment roll alone. Defendants' appeals are on the complete record. At oral argument it was stipulated that plaintiffs' appeal might be considered on the record. Inasmuch as the defendants' appeals deal with the fundamental question of usury, they will be considered first.

## FACTS

This action was brought on the theory that with intent to violate the Constitution[*] and the Usury Law of California,[**] defendants, by an agreement dated September 27, 1943, demanded of plaintiffs, for forbearance of their claims, a greater value than 10 per cent per annum, the maximum permitted by law. Taking the evidence, and the reasonable inferences therefrom, most strongly in favor of plaintiffs, as we are required to do, the facts are as here set forth.

Plaintiffs were engaged in a joint adventure constructing 153 houses in Contra Costa County as a defense housing project under title VI of the National Housing Act. The title to the property upon which the houses were constructed stood in the names of plaintiffs. All 153 lots were subject to first deeds of trust to San Jose Building & Loan Association (later known as Pioneer Investors Savings & Loan Association) in the sum of approximately $589,600 (averaging about $3,850 per house). Defendants had furnished building supplies and materials to plaintiffs and on September 27, plaintiffs owed defendants $63,420.91, for which amounts mechanics'

---

[*]Article XX, § 22.
[**]Deering's Gen. Laws, 1944, Act 3757.

liens were of record as liens second to the deeds of trust. Defendants also had instituted various actions for the enforcement of the liens and the recovery of the amounts due them. The market value as of this date was variously estimated from $4,250 to $4,750 per house. The total value of the lots and improvements (at their highest estimate) was $726,750. Deducting the $589,600 deed of trust indebtedness and the mechanics' lien indebtedness of $63,420.91, totaling $654,020.91, it appears that the equity or the amount which the plaintiffs could then expect to realize if the houses were all sold at their highest estimate would be $73,729.09. The president of Calimpco, Inc., testified that the actual cost of the land and houses was $641,000. Thus there was due against the property practically as much as it and the houses had actually cost. Of course, if the lower estimates of value are accepted, the margin between the market value and the indebtedness entirely disappears. It is evident that at this time, if plaintiffs were to come out whole on the project, it was necessary that defendants withhold foreclosure of their liens. Some of the houses were uncompleted and the amount of money in the construction loan account of the building and loan association was not sufficient either to pay the liens or to complete construction. More money was needed. (Later, $9,300 was advanced by the building and loan association to complete construction.) The houses were not selling readily. Most of them were occupied by renters. The aggregate rentals approximated $90,000 per year. The annual loan payments were approximately $55,000.

In the months of August and September a creditors' committee had been formed by defendants and meetings were held with plaintiffs. There was various testimony that at one of the creditors' meetings with plaintiffs an agreement had been submitted which was supposed to be satisfactory to all concerned, when Tisher, one of the plaintiffs, refused to sign on the ground that it did not contain a release of personal liability. The plaintiffs then withdrew to another room to discuss the matter, and when they came out offered the 20 lots (and possibly the water deposit, hereinafter mentioned) as consideration for a release of personal liability. Tisher desired this because he wished to do further construction work and could not have his financial standing impaired. There was some conflict as to whether a release of personal liability had been previously discussed, or an offer of 20 lots "bonus" made. There was testimony by Mooser, president of Calimpco,

and Shaffer, secretary, that the creditors had not asked for the 20-lot bonus. There was also testimony to the effect that defendants at first refused to accept plaintiffs' proposition. Finally, however, the agreement dated September 27 was signed by all parties.

This agreement, entered into between plaintiffs as first parties, Carl Warden, S. C. Forsey and Frank Norman as second parties* and defendants as third parties, referred to the fact that certain difficulties had arisen regarding the finishing of certain of the houses and that third parties were creditors and lienholders. It stated that all parties desired defendants' claims to be paid in full together with interest at 4 per cent per annum, that the equities of first parties be preserved insofar as they could be preserved without prejudice to defendants' rights, and that the houses be completed. It then provided that plaintiffs would convey to a certain title company title to all the property and a $12,000 deposit with the water company, subject to a prior assignment to the building and loan association. (This deposit was repayable without interest over a 10-year period, from water payments made from time to time to the water company by householders.) The second parties were to have full power to sell or lease, or if necessary refinance all the houses on such terms as they might determine, except that the selling prices and rentals could not be less than those set forth on an annexed schedule (most of the houses $4,750 or $4,700, 7 houses $4,500). The receipts from sales and rentals were to be used to pay the building and loan association, the expenses of the trustees, and defendants' claims plus 4 per cent per annum; the balance, if any, then to be paid plaintiffs. Defendants agreed to release their liens and "In addition thereto, . . . they do hereby release first parties and each of them from any personal liability or any deficiency and agree to look solely to the properties herein described for the payment of their claims." The title company was to convey to purchasers title to the respective lots when paid for.

Now comes the portion of the agreement upon which the claim of usury is based. When all indebtedness had been paid, "The Title Company shall thereupon reconvey said lots which are unsold to first parties as their interest may appear, save as to twenty (20) lots which are referred to in paragraph 13 hereof.

---

*Hereafter referred to as "trustees."

"13. As additional consideration for second and third parties entering into this agreement, first parties agree that at the termination of this agreement or when all lots have been sold save for twenty (20) lots in number, they will deed, or cause Title Company to deed, to such person, firm or corporation as may be designated by second parties, twenty (20) lots from those above described. Said twenty (20) lots shall be owned by and held for the benefit of third parties in proportion to their respective claims. No part of any selling price of said twenty (20) lots, nor of any rentals received thereon after such conveyance, shall belong to first parties, nor shall such selling price, if said lots are thereafter sold, or rentals received after such conveyance, be applicable in payment of the claims of third parties, it being understood that the entire profit or gain from said twenty (20) lots shall be the sole property of third parties." A contemporaneous agreement was entered into by which plaintiffs agreed that in the event of bankruptcy, the release of personal liability should become void.

Pursuant to the agreement, the plaintiffs conveyed their title to the title company and the trustees proceeded to manage the disposition of the houses. The houses were sold at prices for the most part in excess of the minimum set forth in the agreement, the deeds of trust were paid off, the expenses of the trustees paid, and on July 16, 1946, the claims of defendants were paid in full plus interest at the rate of 4 per cent per annum.

Until nearly the end of 1944 from 20 to 25 houses only were sold, and of them, as to one house only did the down payment cover the difference between the purchase price and the amount due against it under the deed of trust. In most instances during that period small down payments only were made with the balance payable over a period of years.

As provided in the agreement, the trustees designated 20 lots to be held for the benefit of defendants. On July 16, plaintiffs were informed that defendant Frank Norman (who was one of the trustees) had offered $20,000 for these 20 lots. Plaintiffs were given an opportunity to buy them at that price. The plaintiffs having declined so to do, the title company was instructed by the trustees to convey the lots to Norman, ostensibly for said sum of $20,000. Norman thereafter sold them for a sum which the court found netted Norman $44,950, of which Norman distributed $20,000 to the defendants, after paying the expenses of the sale.

There was also testimony to the effect that before the agreement, plaintiffs had been trying for some time to work out an arrangement to save the project, and that this continued after the agreement was executed; that as late as 1945 an agreement was considered with another party to take over and pay the creditors 80 per cent of their claims, which agreement was to be subject to approval of plaintiffs, or they could meet that bid; and that at one time almost all of the creditors had agreed to settle at 50 cents on the dollar. Thus it appears from the record that even more than a year after the agreement of September, 1943, the creditors did not believe they would get their claims paid in full, and the plaintiffs expected to realize very little from their interest.

### FINDINGS

The court found substantially the facts as hereinbefore set forth; that the minimum selling prices fixed in the agreement aggregated $723,700, and were the fair market value of the properties at the date of the agreement; that plaintiffs' equity was valued at at least $134,000 over the amounts of the deeds of trust, and that the water deposits and other personal property transferred under the agreement were then of the value of $14,750; that the payment of plaintiffs' indebtedness to defendants was amply secured by the agreement and the transfers made thereunder; that the agreement was fully performed, and the indebtedness fully paid within three years, and "That the said period of three years was a reasonable time for the performance of said agreement and for the full payment of the aforesaid indebtedness. . . .

"That the said agreement of September 27, 1943, was entered into by the parties thereto, and the aforesaid interest and the additional consideration or bonus of twenty (20) lots of real property was agreed to be paid and delivered by plaintiffs to defendants, in consideration of and as compensation for the forbearance by defendants to insist upon the immediate payment of the aforesaid indebtedness then due, owing and unpaid from plaintiffs to defendants, and the agreement of defendants to wait to receive payment of such indebtedness from the proceeds of rentals and sales of plaintiffs' said real property, as and when and in such installments as the Creditors' committee should direct, and that on or about July 16, 1946, after payment of the aforesaid indebtedness had been completed, the said twenty (20) lots were taken by defendants as additional consideration for said forbearance."

The court then found that on July 16, 1946, the 20 lots were of the fair market value of $44,950 over and above existing encumbrances, the net amount for which Norman sold them; that Norman kept $24,950 of this sum under agreement with the trustees of which he was one, and that it was kept by him as "additional consideration or compensation for the forbearance of the indebtedness of plaintiff[s] to defendants." It found in detail the amounts of interest and share of said $20,000 each defendant had received "for the forbearance of the aforesaid indebtedness . . . from September 27, 1943, to July 16, 1946" which constituted an amount "far in excess of ten per cent (10%) per annum" upon said indebtedness. It then found that in making the agreement defendants contemplated and intended that the amounts to be charged in money and things of value for said forbearance would exceed 10 per cent per annum upon the indebtedness and that with intent to violate the Constitution and the Usury Law of California, defendants "charged, took and received" such amounts.

As to defendants Luther Warda and G. Mazzera Building Materials Company, it found that the amounts received by them, including the principal sum, were less than "the total amount asserted as a claim by said defendants on September 27, 1943" and therefore were not usurious. As to defendant Arco Building Company, it found that it was the assignee of C. M. Homes, Inc., and therefore the amounts received by said defendant were not usurious, and it gave judgment against plaintiffs for said defendants.

The court then gave judgment against all the other defendants respectively for three times the total interest and share of the $20,000 received by such defendant.

Against defendant Frank Norman individually the court gave judgment to plaintiffs in the sum of $74,850, being three times the profit realized by him from the sale of the 20 lots.

### Was the Agreement of September 27 Usurious?

In considering this question it is well settled that before this court can reverse the findings of the trial court, we must find, as to controverted questions of fact, after resolving all conflicts in and all legitimate inferences from the evidence in favor of those findings, that there is no substantial evidence which will support the court's conclusions. Defendants contend that the 20 lots were not consideration for a forbearance but for releasing plaintiffs' personal liability. This involves questions of fact as well as law.

The evidence shows that while the facts might be interpreted as showing that the 20 lots were given solely for the release of personal liability, they may also be interpreted (and far more reasonably so) as showing that they were given both for a release of personal liability and for defendants' forbearing to press their claims and their liens. The agreement on its face states that they are given "As additional consideration for second and third parties entering into this agreement . . ." While it is true that the plaintiffs had refused to enter into an agreement until defendants would agree to release their personal liability and offered the 20 lots to defendants as an inducement for the release as well as the forbearance, the whole history of the transaction between the parties shows clearly that this was but an incident, although an important one, in the negotiations which finally ended in the signing of the agreement.

Defendants contend that the fact that there is no conflict in the evidence that plaintiff Tisher refused to sign the agreement until the release of personal liability was added to it, makes it a matter of law that the bonus was offered solely for that release. This ignores the fact that the evidence shows that a vital part of the entire transaction was the stopping of the various lien foreclosure suits and the obtaining by plaintiffs of time in which to pay off their indebtedness. The agreement itself says so; and this is true, even though the plaintiffs probably would not have accepted the forbearance without the release of personal liability. It is obvious that the plaintiffs would not have offered nor would the defendants have taken the 20 lots, if the agreement dealt alone with release of personal liability.

Article XX, section 22, of the Constitution provides: "The rate of interest upon the loan or forbearance of any money, goods or things in action, or on accounts after demand or judgment rendered in any court of the State, shall be seven per cent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest not exceeding ten per cent per annum.

"No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than ten per cent per annum upon any loan or forbearance of any money, goods or things in action."

The Usury Law provides: "§ 1. Legal Rate of Interest:

Contract rate. The rate of interest upon the loan or forbearance of any money, goods or things in action or on accounts after demand or judgments rendered in any court of this state, shall be seven dollars upon the one hundred dollars for one year and at that rate for a greater or less sum for a longer or shorter time; but it shall be competent for parties to contract for the payment and receipt of a rate of interest not exceeding twelve dollars on the one hundred dollars for one year and not exceeding that rate for a greater or less sum or for a longer or shorter time, in which case such rate exceeding seven dollars on one hundred dollars shall be clearly expressed in writing.''

It is ''the manifest intent of the act to forbid absolutely to the lender any profit whatever by way of commission, bonus or other kind of charge, if in doing so the maximum rate declared in the act was exceeded.'' (*Haines* v. *Commercial Mortgage Co.*, 200 Cal. 609, 615 [254 P. 956, 255 P. 805, 53 A.L.R. 725].)

FORBEARANCE

Defendants contend that the giving of the 20 lots was not for a ''loan'' or ''forbearance.'' ■ Ancillary to this contention is the one that the trial court erred in not making a specific finding on the allegation in defendants' answer that the 20 lots were given solely for a release of personal liability. While the court did not make such specific finding, it did find that the lots were taken for the forbearance of the indebtedness and that they were intended to be so taken with intent to violate the usury act. Such a finding is a complete negation of the contention that they were taken solely for the release of personal liability and hence there was no need to find specifically in the language of the answers.

All parties agree that ''forbearance'' as used in the usury laws means, as set forth in 11 California Jurisprudence 10-Year Supplement 112, ''a waiting to collect the debt, or an agreement not to insist upon payment at the date of maturity, or the giving of further time.'' (See, also, *Murphy* v. *Agen*, 92 Cal.App. 468, 469 [268 P. 480].) The agreement of defendants not to press their claims or to enforce their liens was clearly a forbearance under the above definition. Defendants contend, however, that the circumstances here bring them within the rule of hazard, ''as where one advances money under a contract that may be satisfied by delivery of property of uncertain or speculative value or the payment of an increased amount by a specified date—the amount to be

repaid may be considered a price set for the surrender of an investment, rather than a usurious loan.'' (11 Cal.Jur. 10-yr. Supp. 112.) There is evidence that defendants' claims were in hazard; that is, that because of the pendency of the war, the comparatively small margin between the total indebtedness of defendants, deeds of trust and all, and the then market value of the property, the doubt as to whether all the houses could be sold, and the possible effect of an early termination of the war, it was uncertain whether defendants would eventually be paid off. On the other hand, the court found, and there is substantial evidence to support the finding, that plaintiffs' equity in the property, the amount of the rentals and payments then being made, and the other circumstances of the case, showed that plaintiffs' claims were not in hazard and were reasonably well secured.

Defendants contend that a release of personal liability is not a forbearance, and that if the bonus was given partly for an extension which would be usurious, and partly for the release of personal liability (in other words, a consideration which was partly for a usurious purpose and partly for a nonusurious purpose), the agreement as a whole would lose its usurious character, if the nonusurious purpose was the prime factor. Hence, say defendants, the court should have found the proportion of the alleged nonusurious factor to the usurious one. For this contention defendants rely principally on *Lamb* v. *Herndon*, 97 Cal.App. 193 [275 P. 503]. There it was necessary for appellants to pay off a second purchase money mortgage on their property. They also wanted to improve the hall and lodge-room building located on it. They had called for bids for remodeling. Respondents had bid to do the work for $87,900. An agreement was entered into in which respondents agreed, among other things, to pay $12,000 on the mortgage, to do the remodeling, and obtain for appellants a loan on the building when completed to finance its cost as well as the balance of the purchase price, for all of which respondents were to receive a bonus of $12,000 as well as repayment of the moneys advanced and cost of doing the work. It was contended that this constituted the giving of a bonus of $12,000 for a $12,000 loan and hence usurious. The trial court found that the bonus was not given for the loan but for the financing of the purchase of the property and the remodeling of the building, and that there was no intent to commit usury. (This latter finding alone distinguishes the Lamb case from ours.) On appeal the court, after pointing out this

finding, said (p. 200): "On a contract to secure the price or value of work and labor done or to be done, or of property sold the contracting parties may agree upon one price if cash be paid and upon as large addition to the cash price as may suit themselves if credit be given. It is neither a loan nor the forbearance of a debt, but simply a contract price of work and labor done or property sold. [Citations]." It also held that respondents were put in hazard as, in the event of a failure to obtain the loan, after completion of the building, respondents would "have to look for payment of their outlay in financing the purchase of the property and remodeling the building to the equity owned by appellants in the property." (P. 201.) The holding in the Lamb case is, in effect, that where the loan is merely incidental to a contract in which a bonus is given, and is given without intent to commit usury, the bonus will be held not usurious. The same rule was upheld in the following cases, cited by defendants: *Miley P. Corp., Ltd.* v. *Amerada P. Corp.*, 18 Cal.App.2d 182 [63 P.2d 1210], where the court said that the loan was merely incidental to the drilling contract; *Freedom Oil Works Co.* v. *Williams*, 302 Pa. 51 [152 A. 741], where the court held the loan to be merely incidental to the agreement to use plaintiff's products exclusively; *Gillette* v. *Ballard*, 25 N.J.Eq. 491, where the court held that the loan was incidental to a partnership operation of a hotel. 66 Corpus Juris, page 193, section 100, uses the language that "where there is an additional consideration other than the mere extension of time, the forbearance is not usurious." An examination of the cases cited thereunder fails to support such a broad statement. ▉ These cases show that the true rule is, as set forth in the abovementioned cases, that where the loan or forbearance is merely incidental to the balance of the agreement, usury will not apply. In this case, the facts would not justify a finding that the forbearance was merely incidental to the release of personal liability.

Thus far, we have been assuming that a release of personal liability is not a forbearance. While counsel have cited, and we have been able to find, no case definitely determining the matter, there are cases which seem to assume that release of personal liability is a forbearance. Thus, in *Missouri K. & T. Trust Co.* v. *McLachlan*, 59 Minn. 468 [61 N.W. 560], defendant borrowed certain money of plaintiff giving promissory notes and a mortgage therefor. An agreement was entered into by which it was agreed that in the event of defendant's death

before payment of the notes, the unpaid notes and mortgage would be cancelled. The sums to be repaid included not only the money loaned and interest but a sum for this guarantee to cancel debt in case of death. The court, in holding the agreement usurious, referred to this guarantee as one of "perpetual forbearance" ([61 N.W.] p. 562). Again, in *Krumsieg* v. *Missouri K. & T. Trust Co.*, 71 F. 350, in a similar situation, the court referred to the "agreement for perpetual forbearance" (p. 353). See, also, *Doyle* v. *American Loan Co.*, 185 Ark. 233 [46 S.W.2d 803].

On analysis, release of personal liability is a forbearance—a forbearance permanently to assert a claim. To hold otherwise would be to make the usury statues inapplicable to secured loans, as a lender could require a usurious interest to give the lender a perpetual forbearance. Such a ruling would be subject to the qualification that where the security was hazardous, usury would not apply to the consideration for the release. In this case, however, the court held that the security was not hazardous.

### OTHER CONTENTIONS

Defendants contend that the agreement cannot be held usurious for the reason that there is no definite time provided in the agreement when the defendants were to be paid. The court found, in effect, that the agreement contemplated payment within a reasonable time, and then found that three years (the time actually taken) was a reasonable time. The time element is important, for if the value of the 20 lots is spread over a longer period than three years, it, added to the 4 per cent interest, would not constitute more than 10 per cent interest on the amount of the claims. Again, even though there is evidence to support a contrary finding, the trial court's determination on this question is binding upon us, as there is substantial evidence to that effect. For example, the rentals then coming in were $35,000 more per year than the deed of trust payments required, and hence the defendants could be paid off in less than three years. The same is true of defendants' contention that their obligation, or that of the trustees, to manage the properties, etc., makes the agreement other than one of forbearance. Even assuming, as they contend, that the agreement constituted a novation, the situation was not changed. (However, there is no pleading of a novation.) The new agreement shows that the debt continued to exist because it provided for its payment with interest. The

minimum prices set in the agreement on the 20 lots (that is, on any 20 lots defendants might choose) showed that defendants would receive at least $20,000 above the encumbrances on those lots.

■ Defendants contend that the minimum price schedule is not evidence of fair market value. The prices were, at least, admissions by defendants. (*Nelson* v. *Fernando Nelson & Sons,* 5 Cal.2d 511, 519 [55 P.2d 859]; *Wood* v. *Niemeyer,* 185 Cal. 526 [197 P. 795].) In addition, there was substantial evidence of value to support the court's determination.

■ Defendants contend that there was no evidence of intent to violate the Usury Law. The terms of the agreement itself justify an inference of intent. Moreover, Attorney Green, who represented defendant Brown Construction Company, testified as follows: "Q. You would have taken everything they offered. It is lucky they didn't offer you more than 20 houses? A. Well, they owed the money and they weren't able to pay it and it was only right they give us anything they had. That was only fair."

F. H. Kappeler, one of the plaintiffs, signed the agreement as one of the first parties and also signed it as a creditor. We fail to see how this changes the situation as to usury.

### JUDGMENT AGAINST INDIVIDUALS

■ Defendants complain of the judgments against certain individual defendants, to wit, Warden, Forsey and Mills. Warden was a partner in Warden Bros., a copartnership, and the judgment was jointly against the partnership and him. The court awarded the judgment against Warden on the theory that as a member of the copartnership he was jointly liable with it. Section 2409, subdivision a, of the Civil Code (since the judgment codified into the Corporation Code) read: "All partners are liable: (a) Jointly and severally for everything chargeable to the partnership under sections 2407 and 2408." Section 2407 provided: "Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, *or any penalty is incurred,* the partnership is liable therefor to the same extent as the partner so acting or omitting to act." (Emphasis added.) In view of the sections and the admission in the answer, the court had the right to award a joint and several judgment against both the partnership and the admitted partner.

■ The same situation applies to Mills, who was a member

of the copartnership of Mills & Hinz Tile Company. Mills individually was not named as a party. However, the action against the partnership was in its common name and hence comes within the provisions of section 388 of the Code of Civil Procedure. The return of service of summons, which we have had brought up from the trial court, shows that he was served. Therefore the judgment, pursuant to that section, is proper. ". . . the judgment in the action shall bind the joint property of all the associates, and the individual property of the party . . . served with process, in the same manner as if all had been named defendants and had been sued upon their joint liability.''

█ As to defendant Forsey, he was president and a director of Eureka Mill & Lumber Company, a corporation. There is no contention that he received anything individually. Judgment was given against him jointly with the corporation. Section 3 of the Usury Law provides for recovery in treble amount against the "person, company, association or corporation . . . or . . . his *or its personal representative*" receiving the usurious payment. (Emphasis added.) In *Hillier* v. *Muth,* 132 Cal.App. 486, 489 [23 P.2d 46], cited by defendants, the court said: "The words 'personal representative' do not mean 'agent,' but are used in the sense of 'executor' or 'administrator'; . . .'' However, the court there was considering a situation in which the defendant corporation and its manager, also a defendant, were acting as agents of the corporation claimed to have received the usurious payment. The case merely holds that "personal representative" does not include an "agent." That the language means something more than an executor or administrator is shown by the use of the word *"its.''* A corporation cannot have an executor or administrator. Moreover, considering that part of the section with the last sentence of the section—"The penalties herein provided for the violation of this section and said sections one and two shall apply to and be imposed upon each member of any unincorporated company, association, or of any copartnership and upon each officer and director of a corporation who shall violate either of said sections"—it is obvious that a director and president of a corporation, who, as here, is active in the obtaining of the usurious payment, may be held liable for the statutory penalty. The judgment against Forsey was proper.

### The Judgment Against Warden Bros.

█ The record fails to show a direct payment to Warden Bros. However, a reasonable inference from the evidence is

that the payment made to Frank Antonioli was for the benefit of Warden Bros. In their answer they admit that they with the other defendants received "the amount paid for said twenty (20) lots by" Norman. On Warden Bros. letterhead, signed by Carl A. Warden, is a direction to the title company to pay Antonioli the sum of $5,881—which was the proportion due Warden Bros. from the $20,000 paid by Norman for the 20 lots. There is no contention that Warden Bros. had assigned their claim to Antonioli. A payment to another at the request of a creditor is a payment to the creditor. (Civ. Code, § 1476. See *Wolf* v. *Aetna Indemnity Co.*, 163 Cal. 597 [126 P. 470].) The finding concerning the amount received by Warden Bros. is supported by the evidence.

### Plaintiffs' Appeal

Plaintiffs contend that the trial court erred in holding (1) that defendant Arco Building Company, as assignee, was not liable for the statutory penalty; (2) that Warda and Mazzera likewise were not liable; and (3) in charging defendants with their respective proportions of $20,000, rather than with the value of the 20 lots.

### 1. Arco Building Company

The court found and the evidence shows, that in December, 1944, C. M. Homes, Inc., which was one of the third parties to the agreement of September 27, assigned to Arco the balance of indebtedness then remaining, to wit, $3,420, and that Arco received the total sum of $1,516.15 as compensation for the forbearance. The court apparently believed that because Arco was an assignee *after* the agreement it could not be held liable even though it actually received the benefit of the usurious contract and received the usurious payments. (It is interesting to note that although defendant Mills & Hinz Tile Company was an assignee of Cummins & Morton Tile Company, one of the creditors who signed the agreement, plaintiffs were given judgment for the statutory penalty against Mills & Hinz Tile Company.) ▆▆▆ Patently the court erred in holding that an assignee cannot be held liable for accepting usurious interest. If this were the law, the statutes on usury might as well be abolished. All a lender would have to do would be to obtain a contract from a borrower providing for usurious interest,— 20 or 30 per cent or more per year,—and then assign his contract and the contract would no longer be usurious. "In the event of the assignment or transfer of a usurious contract by the lender, if the assignee has received the usurious interest,

he alone is liable for the statutory penalty, although the rule appears otherwise where the usury has been received by the payee of the obligation.'' (55 Am.Jur. p. 429, § 153.)

The California usury statute provides that where a usurious payment has been made, the payer may recover treble the amount of money paid or value delivered from the one who ''shall have taken or received the same.'' In *Liebelt* v. *Carney,* 213 Cal. 250 [2 P.2d 144, 78 A.L.R. 405], the court cited with approval the rule stated in 39 Cyc. 1038: ''The proper party defendant is the person who has received the usury. It is not necessary that a third person to whom the notes executed for the usurious loan were made payable should be joined if he received no part of the usury. But when the usurious note has been transferred to a holder in due course, to whom the maker is compelled to make payment, the original payee is the proper party defendant.''

It is significant that in the answer to the complaint Arco Building Company expressly admitted that it signed the agreement (although this is not the fact). The court's conclusion that Arco Building Company was not liable is erroneous.

2. *Warda and Mazzera*

G. Mazzera Company filed a mechanic's lien in the sum of $4,049.45 for materials supplied Luther M. Warda. Luther M. Warda filed liens totaling $15,760.20. (Apparently included in the Warda liens were the same items included in the Mazzera lien.) As of the date of the agreement, in a conference with the creditors' committee (who were the second parties in the agreement) Warda agreed to compromise his claims for $8,902.20. Thus Warda and Mazzera agreed to accept that sum instead of the $15,760.20. The court found that the $8,902.20 was the indebtedness due Mazzera and Warda and that the total amount received by them under the contract for the forbearance was $3,551.83. Thus the total amount received by them was $12,454.03, or approximately $2,500 less than their original claim. It was stipulated that Mazzera received only the principal amount of their mechanic's lien, $4,049.45, ''no interest, or any bonus or any profit . . . and no portion of the 20 lots . . .'' In view of that stipulation the judgment in favor of Mazzera was proper.

As to Warda, however, the situation is different. We are not impressed by the fact that the claim asserted earlier was for a higher amount. It is the amount contemplated by

the agreement and upon which the 4 per cent interest was to be paid which is the amount as to which the test of usury must necessarily be made.

The usury statute would have a hole in it as wide as a barn door if it were so interpreted that where a compromise figure is agreed upon, interest thereon in excess of the 10 per cent permitted by law may be charged, even though such interest added to the principal totals less than the claim originally asserted. " 'Laws enacted to guard against unreasonable rates of interest are laws against oppression, and should be favorably regarded, as they have always been favored by the common law of England' (*Eaker* v. *Bryant*, 24 Cal.App. 87 [140 P. 310] )." (*In re Washer*, 78 Cal.App. 759, 773 [248 P. 1068].) The court's conclusion that Warda was not liable is erroneous.

3. *Were Defendants Chargeable With the Value of the Lots?*

In determining the amount of bonus chargeable to each defendant, the court used the figure of $20,000 which was the amount Norman distributed to defendants after sale of the 20 lots. Plaintiffs appealed from the judgment entered in their favor, contending that the defendants should be charged with their respective proportions of the *value* of the 20 lots when taken by them on July 16, 1946. The court found this value to be $44,950 (over and above existing liens and encumbrances). This was also the amount for which Norman sold them. Plaintiffs' contention is correct. The Usury Law prohibits the taking of "money, goods or things in action, or in any other manner whatsoever, any greater sum or any greater value" than the maximum allowed. Here the defendants received not money, but lots, and they are chargeable with the value of those lots at the time they received them, regardless of what amount of money they actually realized from their sale. For example, had the value increased, and, upon sale, had defendants received more than their value as of the day they received the lots, they could not be charged with that increase in value, or the amount they actually realized from their sale. The agreement provided that the trustees might select the particular lots and they would then be deeded to such person as the trustees might designate. "Said twenty (20) lots shall be owned by and held for the benefit of third parties in proportion to their respective claims." Hence when the trustees had the lots conveyed to Norman, they became the property of the defendants who immediately became chargeable with their value, rather than with the pro-

ceeds of their sale thereafter. The fact that the lots were selected, at the suggestion of plaintiffs, by chance, does not change the situation any.

Defendants contend that the error, if any, in apportionment of liability was invited by plaintiffs, and therefore they cannot now complain. After trial and before the decision, plaintiffs at the direction of the trial court amended their complaint to charge defendant Norman with receiving $26,234.60 and to add to the prayer a request for judgment against him in the sum of $74,850. Defendants cite cases which hold that where a party adopts a theory at the trial he cannot on appeal complain of a finding in favor of that theory. It is not necessary to discuss those cases as that unquestionably is the law. They are not applicable here, however, as the error was not invited by plaintiffs. They still sought damages against the defendants for treble the full amount. The amendment to the complaint was to conform to the court's erroneous theory as to Norman. The amendment merely increased the amount alleged against Norman and did not eliminate or reduce the amounts alleged against any of the defendants nor did it change the theory of the action against them. "A plaintiff may appeal from a judgment in his favor, when the amount of said judgment is less than the amount demanded and to which the plaintiff considered himself entitled. But in such a case the appeal is not from that part of the judgment in plaintiff's favor, but is from the provisions of the judgment denying him the full relief demanded." (*Maxwell Hardware Co.* v. *Foster,* 207 Cal. 167, 170 [277 P. 327].)

Defendants also contend that the wording of paragraph 13 of the agreement is ambiguous, in that it is not clear whether defendants are chargeable for the value of the 20 lots or for the proceeds thereof, and therefore, in charging the defendants only with the amount they received from Norman the court was interpreting the ambiguity in their favor. They point, moreover, to the fact that when the lots were offered for sale they gave plaintiffs an opportunity to buy them for the same sum that Norman distributed to the defendants. The difficulty about this contention is that the evidence shows that the actual sale price of the lots was $44,950 and not $20,000. The court did not find, nor does the evidence show, that there was a sale to Norman, nor did the court interpret

the agreement as claimed. The court found, and the evidence supports the finding, that the lots were conveyed to Norman, who thereafter sold them for $44,950 and divided $20,000 among the defendants. Moreover, there is no ambiguity in paragraph 13. It specifically provides that the lots when selected shall be owned by and held for the benefit of defendants. It then provides that no part of any selling price nor of the rentals after conveyance shall belong to first parties nor be applicable in payment of the claims of defendants, ". . . it being understood that the entire profit or gain from said twenty (20) lots shall be the sole property of third parties." Therefore the judgment should be increased, and the respective defendants charged with their proportionate shares of the $44,950 value of the lots rather than the $20,000 distributed.

## COMPLAINT

Defendants attack the complaint as not stating a cause of action. The complaint alleged that the agreement was given in "consideration of the forbearance by defendants to insist upon the immediate payment of their claims" and other matters to the same effect. Defendants contend this was not an allegation of an agreement to extend the time of payment. The complaint's allegations together with the terms of the annexed agreement are sufficient on this question. One of the allegations was to the effect that the lots were additional consideration for the agreement. Defendants contend that such allegation causes the complaint to be defective in that it does not allege that the bonus was given solely for the forbearance. It did not have to be the sole consideration in order for the agreement to be usurious. Defendants contend that after the agreement was signed there no longer was a debt to forbear because plaintiffs were under no personal liability. Personal liability is not an indispensable requisite to constitute a debt. (*Shelley* v. *Byers*, 73 Cal.App. 44, 58 [238 P. 177].) Again it is contended that the agreement was not usurious on its face because no time was fixed for payment. To constitute usury it is not necessary that there be a fixed time in the agreement. "In testing a transaction for usury, interest must be computed on the actual sum advanced from date of advancement. . . . Where the excessive interest is caused by a contingency under the lender's control, or not under the borrower's control, the transaction is usurious." (*Penziner* v. *West American Finance Co.*, 133 Cal.App. 578, 590 [24 P.2d 501].) The agreement, not having any speci-

fied time of payment set forth therein, must be construed as coming within section 1657 of the Civil Code and is deemed to provide for a reasonable time, and hence, what was a reasonable time was a matter to be left to the determination of the court. ▉ Assuming, as contended by defendants, usury did not appear on the face of the agreement, the holding in the Penziner case (*supra*, p. 589) applies: "On its face the transaction does not appear usurious. '. . . it is always permissible to show that a transaction, ostensibly lawful, actually constituted a usurious loan and was made with intent to evade the statute. . . .' ''

▉ However, the agreement did show that it was usurious. For the release of personal liability and an extension of the time of payment of the $63,420.91 which amount was then due, defendants were to receive 4 per cent interest per annum plus 20 lots of a fixed minimum sale price, with a power of sale in the trustees to sell all the property at any time. The agreement likewise provided minimum rental values at a sum approximating $35,000 per year more than the required payments on the deed of trust. This, on the face of it, would have paid defendants off in not to exceed three years. Taking the fixed minimum value of the lots, less the encumbrances, plus the interest provided, and dividing the total by three, would immediately show a return to defendants of more than 10 per cent interest per year.

The judgments in favor of Arco Building Company and Luther Warda are reversed. The judgment in favor of Louis Mazzera, doing business as G. Mazzera Company, sued herein as G. Mazzera Building Materials Company, is affirmed. The judgment as entered against all other defendants is set aside and the trial court is directed to amend the findings and conclusions of law and reenter judgment in favor of plaintiffs and against all defendants, other than Mazzera, in accordance with the views herein expressed. Plaintiffs shall recover costs on all appeals except as to the defendant Mazzera, who shall recover costs.

Peters, P. J., and Wood, J. (Fred B.), concurred.

A petition for a rehearing was denied December 15, 1950, and defendants and appellants' petition for a hearing by the Supreme Court was denied January 11, 1951. Shenk, J., Schauer, J., and Spence, J., voted for a hearing.